```
                              FILED
                      CLERK, U.S. DISTRICT COURT

                         9/12/22

                    CENTRAL DISTRICT OF CALIFORNIA
                    BY: _____ DEPUTY
                              CS
```

ANISHA DASGUPTA, General Counsel
MILES D. FREEMAN, Cal. Bar No. 299302
mfreeman@ftc.gov
KARINA A. LAYUGAN, Cal. Bar No. 302049
klayugan@ftc.gov
CARLA L. CHEUNG, Cal. Bar No. 291562
ccheung1@ftc.gov
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Tel: (310) 824-4300
Fax: (310) 824-4380

*Attorneys for Plaintiff Federal Trade Commission*

TAYLOR STEINBACHER, Cal. Bar No. 285335
Taylor.Steinbacher@dfpi.ca.gov
LOUIS LAVERONE, Cal. Bar No. 296990
Louis.Laverone@dfpi.ca.gov
California Department of Financial Protection & Innovation
320 West 4th Street, Suite 750
Los Angeles, CA 90013
Tel: (213) 576-7500
Fax: (213) 576-7181

*Attorneys for Plaintiff California Department
of Financial Protection & Innovation*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION; and CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION & INNOVATION,<br><br>       Plaintiffs,<br><br>       v.<br><br>GREEN EQUITABLE SOLUTIONS, a corporation, also d/b/a ACADEMY HOME SERVICES; | Case No. CV22-6499-FLA(MARx)<br><br>**PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTMENT OF TEMPORARY RECEIVER, LIMITED EXPEDITED DISCOVERY, AND ORDER TO SHOW CAUSE WHY** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SOUTH WEST CONSULTING
ENTERPRISES, INC., a corporation,
also d/b/a ACADEMY HOME
SERVICE, ATLANTIC PACIFIC
SERVICE GROUP, GOLDEN HOME
SERVICES OF AMERICA
ENTERPRISES, and HOME
MATTERS USA;

APEX CONSULTING &
ASSOCIATES INC., a corporation,
also d/b/a GOLDEN HOME
SERVICES AMERICA and HOME
MATTERS USA CONSULTING;

INFOCOM ENTERTAINMENT LTD,
INC., a corporation, also d/b/a
AMSTAR SERVICE GROUP,
ATLANTIC PACIFIC SERVICE, and
HOME RELIEF SERVICE OF
AMERICA;

DOMINIC AHIGA, a/k/a MICHAEL
DOMINIC GRINNELL, individually
and as an officer of Green Equitable
Solutions, South West Consulting
Enterprises, Inc., and Apex Consulting
& Associates Inc.; and

ROGER SCOTT DYER, individually
and as an officer of South West
Consulting Enterprises, Inc., and
Infocom Entertainment Ltd, Inc.,

Defendants.

**PRELIMINARY INJUNCTION
SHOULD NOT ISSUE**

# NOTICE OF APPLICATION

Pursuant to Federal Rule of Civil Procedure 65(b) and Local Rule 7-19, Plaintiffs the Federal Trade Commission ("FTC") and the California Department of Financial Protection & Innovation ("DFPI") (collectively, "Plaintiffs") hereby apply *ex parte*, without notice to Defendants, for a temporary restraining order.

This case involves an egregious mortgage assistance relief services scam in which Defendants, who are recidivist offenders, falsely tell financially distressed homeowners that they can receive substantial home mortgage modifications in exchange for large up-front payments to Defendants. These illegal and deceptive practices have already cost consumers at least $6.6 million. Entering the proposed *ex parte* temporary restraining order is the only way to protect consumers from imminent, ongoing harm and secure their right to restitution from Defendants, who have a demonstrated track record of concealing their identities, hiding assets, and ignoring adverse judgments.

As detailed below, Defendants Green Equitable Solutions, South West Consulting Enterprises, Inc. ("South West Consulting"), Apex Consulting & Associates Inc. ("Apex Consulting"), Infocom Entertainment Ltd, Inc. ("Infocom Entertainment"), Dominic Ahiga, and Roger Scott Dyer (collectively, "Defendants") have violated and are violating Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the Mortgage Assistance Relief Services Rule ("MARS Rule") (Regulation O), 12 C.F.R. § 1015, the COVID-19 Consumer Protection Act ("CCPA"), Pub. L. No. 116-260, Title XIV § 1401(b)(2), the Telemarketing Sales Rule ("TSR"), and the California Consumer Financial Protection Law ("CCFPL"), Cal. Fin. Code § 90000 *et seq.*, such that Plaintiffs are likely to succeed on the merits and the balance of equities strongly favors the requested relief.

*Ex parte* relief without notice (including an asset freeze and the appointment of a temporary receiver) is necessary for numerous reasons, including that Defendants regularly conceal their identities and assets, operate businesses that are

1   permeated by illegal activity, and have a demonstrated history of ignoring lawsuits

2   and administrative actions by other regulators seeking relief for consumers.  The

3   evidence set forth herein demonstrates a substantial likelihood that, if Defendants

4   receive notice of Plaintiffs' *ex parte* application before a temporary receiver can

5   take short-term measures to preserve the status quo, Defendants will dissipate

6   assets, conceal funds, and destroy evidence.  To stop this ongoing unlawful

7   conduct, to prevent further injury, and to protect consumers' rights to restitution

8   under the law, Plaintiffs respectfully request that the Court grant their request for

9   an *ex parte* temporary restraining order.

10  Dated:  September 12, 2022                Respectfully submitted,

11

12  MILES D. FREEMAN                          TAYLOR STEINBACHER

13  mfreeman@ftc.gov                          Taylor.Steinbacher@dfpi.ca.gov
    KARINA A. LAYUGAN                         LOUIS LAVERONE

14  klayugan@ftc.gov                          Louis.Laverone@dfpi.ca.gov
    CARLA L. CHEUNG                           California Department of Financial

15  ccheung1@ftc.gov                          Protection & Innovation
    Federal Trade Commission                  320 West 4th Street, Suite 750

16  10990 Wilshire Boulevard, Suite 400       Los Angeles, CA 90013

17  Los Angeles, CA 90024                     Tel: (213) 576-7500
    Tel: (310) 824-4300                       Fax: (213) 576-7181

18  Fax: (310) 824-4380

19                                            *Attorneys for Plaintiff California*
    *Attorneys for Plaintiff Federal Trade*   *Department of Financial Protection &*

20  *Commission*                              *Innovation*

21

22

23

24

25

26

27

28

-ii-

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS & AUTHORITIES ...............................................1

I.   INTRODUCTION ..........................................................................1

II.  STATEMENT OF FACTS .................................................................2

   A.   Defendants Operate a Mortgage Relief Scam ...............................2

   B.   Defendants Prey on Financially Distressed Homeowners............................5

   C.   State Agencies Attempt to Prosecute Defendants Without Success..............6

   D.  In an Effort to Avoid Liability, Defendants Dissolve The Existing Entities and Assume New Identities to Continue the Scam .......................8

III.  ARGUMENT .................................................................10

   A.   Issuance of an *Ex Parte* Temporary Restraining Order is Appropriate.......10

     1.  Plaintiffs Have Established a Strong Likelihood of Success .................11

       a.  Defendants Violate the FTC Act .................................................11

       b.  Defendants Violate the MARS Rule .....................................14

       c.  Defendants Violate the CCPA ...........................................17

       d.  Defendants Violate the TSR .............................................18

       e.  Defendants Violate the CCFPL .........................................18

       f.  Defendants Act as a Common Enterprise .............................19

       g.  The Individual Defendants are Personally Liable .....................22

     2.  The Balance of Equities Tips Strongly in Plaintiffs' Favor...................23

   B.   Issuance of an *Ex Parte* Temporary Restraining Order is Necessary to Provide Final Effective Relief .......................................24

IV.  CONCLUSION.................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Chabner v. United of Omaha Life Ins. Co.,* 225 F.3d 1042 (9th Cir. 2000)...........19

*Feil v. FTC,* 285 F.2d 879 (9th Cir. 1960)................................................................11

*FTC v. Affordable Media, LLC,* 179 F.3d 1228 (9th Cir. 1999)....................... 11, 24

*FTC v. Am. Nat'l Cellular, Inc.,* 810 F.2d 1511 (9th Cir. 1987) ............................10

*FTC v. American Home Servicing Center, LLC,* No. 18-cv-597, Dkt. 20 (C.D. Cal.
     Apr. 13, 2018) ................................................................................................24

*FTC v. Commerce Planet, Inc.,* 815 F.3d 593 (9th Cir. 2016) ...............................10

*FTC v. Figgie Intern., Inc.,* 994 F.2d 595 (9th Cir. 1993).....................................11

*FTC v. Good EBusiness LLC,* No. 16-cv-1048, Dkt. 12 (C.D. Cal., Feb. 16, 2016)
     ....................................................................................................................24

*FTC v. Grant Connect, LLC,* 763 F.3d 1094 (9th Cir. 2014) ................................22

*FTC v. H.N. Singer,* 668 F.2d 1107 (9th Cir. 1982) ..............................................24

*FTC v. John Beck Amazing Profits, LLC,* 865 F. Supp. 2d 1052 (C.D. Cal. 2012) 19

*FTC v. Mortgage Relief Advocates LLC,* No. 14-cv-5434, 2015 WL 11257575
     (C.D. Cal. July 1, 2015) .................................................................................14

*FTC v. Pantron I Corp.,* 33 F.3d 1088 (9th Cir. 1994) .................................... 11, 14

*FTC v. Universal Premium Servs., Inc.,* No. 06-cv-849, 2007 WL 9728965 (C.D.
     Cal. Feb. 21, 2007)................................................................................... 11, 13

*FTC v. Verity Intern., Ltd.,* 443 F.3d 48 (7th Cir. 2006) ........................................11

*FTC v. Wealth Educators, Inc.,* No. 15-cv-2357, 2015 WL 11439063 (C.D. Cal.
     Apr. 6, 2015) ..................................................................................................25

*FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020 (7th Cir. 1988) . 11, 14

*FTC v. World Wide Factors Ltd.,* 882 F.2d 344 (9th Cir. 1987) ................. 2, 11, 23

*Johnson v. Couturier,* 572 F.3d 1067 (9th Cir. 2009) ...........................................24

*Kraft, Inc. v. FTC,* 970 F.2d 311 (7th Cir. 1992)...................................................14

*SEC v. First Fin. Grp.,* 645 F.2d 429 (5th Cir. 1981)...............................................25

**Statutes**

15 U.S.C. § 53 ....................................................................................10

15 U.S.C. § 57b ..................................................................................10

Cal. Fin. Code § 90000 .......................................................................18

Cal. Fin. Code § 90003 .......................................................................18

Cal. Fin. Code § 90005 .......................................................................18

Cal. Fin. Code § 90012 .......................................................................10

Public Law 116-260, 134 Stat 1182, Title XIV, Section 1401 .................17

**Regulations**

12 C.F.R. § 1015.3 ........................................................................ 15, 16

12 C.F.R. § 1015.4 ..............................................................................17

12 C.F.R. § 1015.5 ...........................................................................1, 15

16 C.F.R. § 310.4 ................................................................................18

16 C.F.R. § 310.8 ................................................................................18

### NOTES ON CITATIONS

1. References to "Appx.," refer to specific pages within Plaintiffs' Appendix of Evidence in Support of their Application for Temporary Restraining Order with Asset Freeze, Appointment of Temporary Receiver, Limited Expedited Discovery, and Order to Show Cause Why Preliminary Injunction Should Not Issue, filed concurrently herewith.

2. References to "Ex." refer to exhibits attached to the Declaration of Luis Solares ("Solares Decl.") (Appx., 1062-1629).

3. References to "Bedus Decl." refer to the Declaration of Lorraine Bedus (Appx., 1-94).

4. References to "Bialoglovski Decl." refer to the Declaration of Elizabeth Bialoglovski (Appx., 95-121).

5. References to "Borden Decl." refer to the Declaration of Sean Borden (Appx., 967-1061).

6. References to "Cadoy Decl." refer to the Declaration of Michael Cadoy (Appx., 122-222).

7. References to "Cannon Decl." refer to the Declaration of Randy Cannon (Appx., 223-361).

8. References to "Copeland Decl." refer to the Declaration of Corey Copeland (Appx., 362-396).

9. References to "Flores Decl." refer to the Declaration of Norma Flores (Appx., 397-428).

10. References to "Garrison Decl." refer to the Declaration of Perry Lee Garrison (Appx., 429-444).

11. References to "Gionfriddo Decl." refer to the Declaration of Cynthia Gionfriddo (Appx., 445-474).

12. References to "Gloudemans Decl." refer to the Declaration of Carolyn Gloudemans (Appx., 475-505).

13. References to "Kavney Decl." refer to the Declaration of Patrick Kavney (Appx., 506-45).

14. References to "Kena Decl." refer to the Declaration of Abraham Kena (Appx., 546-94).

15. References to "Lescalleet Decl." refer to the Declaration of Richard Lescalleet (Appx., 595-722).

16. References to "Lombardi Decl." refer to the Declaration of Dorothy Lombardi (Appx., 723-69).

17. References to "Maestas Decl." refer to the Declaration of Beatrice Maestas (Appx., 770-817).

18. References to "Russo Decl." refer to the Declaration of Charles Russo (Appx., 818-19).

19. References to "Williams Decl." refer to the Declaration of Shane Williams (Appx., 820-86).

20. References to "Willis Decl." refer to the Declaration of Gregory Willis (Appx., 887-966).

21. References to "Freeman Rule 65(b)(1) Decl." refer to the Rule 65(b)(1) Certification and Declaration of Miles D. Freeman in support of Plaintiffs' *Ex Parte* Application for a Temporary Restraining Order with Asset Freeze, Appointment of Temporary Receiver, Limited Expedited Discovery, and Order to Show Cause Why Preliminary Injunction Should Not Issue, filed concurrently herewith.

## MEMORANDUM OF POINTS & AUTHORITIES

## I.   INTRODUCTION

This case involves an egregious mortgage assistance relief services scam in which Defendants, who are recidivist offenders, falsely tell financially distressed homeowners that they can receive substantial home mortgage modifications in exchange for large up-front payments to Defendants.  Defendants have already been the subject of at least *six* different regulatory proceedings related to false promises of mortgage assistance relief services.  Each time Defendants have been accused of misconduct, they have simply ignored the charges levied against them, concealed their identities and assets, and continued extracting millions of dollars from unsuspecting consumers using new names.  Absent issuance of an *ex parte* temporary restraining order, Defendants will follow the same playbook here and abscond with millions of dollars in ill-gotten funds, leaving little, if any, recourse for the consumers injured by Defendants' conduct.

Plaintiffs present ample evidence to support the issuance of a temporary restraining order on an *ex parte*, non-noticed basis.  Most notably, it is beyond dispute that Defendants have violated at least 12 C.F.R. § 1015.5(a) by charging upfront fees in advance of securing any offer of mortgage assistance relief for the consumer.  *See* Section III.A.1.ii.  And abundant evidence also exists to conclude that Defendants violate each of the other counts pled in the Complaint (*see* Section III.A.1), that the Corporate Defendants operate as a common enterprise (*see* Section III.A.2), and that the Individual Defendants are personally liable (*see* Section III.A.3).  Thus, as detailed below and as evidenced by the 15 sworn declarations from consumers, Plaintiffs demonstrate a substantial likelihood of success on the merits of their claims.

Likewise, the harm to the public is clear and ongoing.  "Harm to the public interest is presumed" in a government enforcement action and the public has a strong interest in preserving the Court's ability to provide a meaningful remedy.

-1-

*FTC v. World Wide Factors Ltd.*, 882 F.2d 344, 346 (9th Cir. 1987). Absent immediate relief, Plaintiffs, and the consumers they seek to protect, will be irreparably harmed by any inability to redress the injury caused by Defendants.

## II.    STATEMENT OF FACTS

### A.    Defendants Operate a Mortgage Relief Scam

Since 2017, Defendants Roger Scott Dyer and Dominic Ahiga[1] (collectively, "Individual Defendants") have operated a mortgage assistance relief services scam through a web of corporate entities and fictitious business names.  The corporate entities at the center of this scheme are Defendants Green Equitable Solutions, South West Consulting Enterprises, Inc., Apex Consulting & Associates Inc., and Infocom Entertainment Ltd, Inc., (collectively, the "Corporate Defendants").  The Defendants present themselves to consumers using fictitious business names, including at least the following DBAs:

| Corporate Defendant | Fictitious Business Name(s) |
|---|---|
| Green Equitable Solutions | Academy Home Services |
| South West Consulting Enterprises, Inc. | Academy Home Service |
| | Home Matters USA |
| | Atlantic Pacific Service Group |
| | Golden Home Services of America Enterprises |
| Apex Consulting & Associates Inc. | Golden Home Services America |
| | Home Matters USA Consulting |
| Infocom Entertainment Ltd, Inc. | Amstar Service Group |
| | Atlantic Pacific Service |
| | Home Relief Service of America |

---

[1] In February 2021, Defendant Ahiga changed his name from "Michael Dominic Grinnell" to "Dominic Ahiga."  *See* Section II.A.3.  For sake of consistency, Plaintiffs refer to this defendant solely by his current name (Dominic Ahiga).

Solares Decl., ¶¶ 4, 22-23 (Appx., 1062-63, 1068); Exs. W & X (Appx., 1235-279).  Individual Defendants Dyer and Ahiga control and manage the day-to-day operations of the Corporate Defendants as part of a common enterprise.  Solares Decl., ¶¶ 20-21 (Appx., 1067-68); Exs. Q-U (Appx., 1194-1228) (articles of incorporation identifying Dyer or Ahiga as officers of the Corporate Defendants); *see also* Section III.A.2.

Defendants market their "services" to consumers primarily through cold call telemarketing[2] (including calls to phone numbers listed on the National Do Not Call Registry) and corporate websites.[3]  Defendants tell consumers that, in exchange for several large upfront payments, Defendants guarantee that they will be able to significantly reduce the consumer's interest rates and/or principal balances.[4]  To further entice consumers, Defendants also frequently represent:

- That the consumer's home cannot be foreclosed on during the time that the consumer is paying for Defendants' "services;"[5]

---

[2] Bialoglovski Decl., ¶ 4 (Appx., 95); Copeland Decl., ¶ 4 (Appx., 362); Flores Decl., ¶ 4 (Appx., 397); Garrison Decl., ¶ 4 (Appx., 429); Gionfriddo Decl., ¶¶ 4-5 (Appx., 445); Gloudemans Decl., ¶ 4 (Appx., 475); Kavney Decl., ¶ 4 (Appx., 506); Kena Decl., ¶ 3 (Appx., 546); Williams Decl., ¶ 4 (Appx., 820).

[3] Exs. A-D (Appx., 1084-1106) (Defendants' websites); Bedus Decl., ¶ 5 (Appx., 1); Cannon Decl., ¶ 3 (Appx., 223); Gionfriddo Decl., ¶ 6 (Appx., 446); Lescalleet Decl., ¶¶ 4-5 (Appx., 595); Willis Decl., ¶¶ 2-3 (Appx., 887).

[4] Bedus Decl., ¶¶ 5-6 (Appx., 1-2); Bialoglovski Decl., ¶¶ 4, 6 (Appx., 95-96); Cadoy Decl., ¶¶ 5, 10 (Appx., 122-24); Cannon Decl., ¶ 4 (Appx., 223); Copeland Decl., ¶ 7 (Appx., 362-63); Flores Decl., ¶ 4 (Appx., 397); Garrison Decl., ¶ 7 (Appx., 430-41); Gionfriddo Decl., ¶¶ 4, 8 (Appx., 445-47); Gloudemans Decl., ¶ 4 (Appx., 475); Kavney Decl., ¶¶ 5, 7 (Appx., 506); Kena Decl., ¶¶ 3, 8 (Appx., 546-48); Lescalleet Decl., ¶¶ 8, 11 (Appx., 596-97); Lombardi Decl., ¶ 6 (Appx., 723-24); Williams Decl., ¶ 5 (Appx., 820).

[5] Bialoglovski Decl., ¶ 4 (Appx., 95); Cadoy Decl., ¶ 10 (Appx., 123-24); Gionfriddo Decl., ¶ 4 (Appx., 445); Kavney Decl., ¶ 6 (Appx., 506); Kena Decl., ¶ 3 (Appx., 546).

- That the consumer need not make and should stop making their regular mortgage payments;[6]
- That the consumer should not communicate with their mortgage provider and should re-route all communications to Defendants;[7]
- That Defendants' "services" are part of, or associated with, a government program, such as those related to the COVID-19 pandemic;[8] and
- That the consumer can receive a refund of their payments at any time because Defendants' services are subject to a "money-back guarantee."[9]

None of these representations are true and several are expressly prohibited by law.

Defendants' promises have enticed hundreds (and potentially thousands) of consumers into signing up for Defendants' "services." Solares Decl., ¶¶ 30-31, 38-50 (Appx., 1069-072, 1074-081). Defendants receive upfront payments from each of these consumers of between approximately $500 and $2,900 every month.[10] Yet

---

[6] Bedus Decl., ¶ 8 (Appx., 2); Bialoglovski Decl., ¶ 4 (Appx., 95); Copeland Decl., ¶ 8 (Appx., 363); Flores Decl., ¶ 7 (Appx., 397-98); Garrison Decl., ¶ 7 (Appx., 430-31); Gionfriddo Decl., ¶ 4 (Appx., 445); Gloudemans Decl., ¶ 6 (Appx., 476); Kena Decl., ¶ 3 (Appx., 546); Lescalleet Decl., ¶ 11 (Appx., 596-97).

[7] Bedus Decl., ¶ 8 (Appx., 2); Bialoglovski Decl., ¶ 4 (Appx., 95); Cannon Decl., ¶ 5 (Appx., 223); Flores Decl., ¶ 7 (Appx., 397-98); Garrison Decl., ¶ 7 (Appx., 430-31); Gionfriddo Decl., ¶ 4 (Appx., 445); Gloudemans Decl., ¶ 6 (Appx., 476).

[8] Bedus Decl., ¶ 5 (Appx., 1); Gionfriddo Decl., ¶ 4 (Appx., 445); Gloudemans Decl., ¶ 4 (Appx., 475); Kavney Decl., ¶ 5 (Appx., 506); Maestas Decl., ¶ 5 (Appx., 770-71); Russo Decl., ¶ 3 (Appx., 818).

[9] Bialoglovski Decl., ¶ 4 (Appx., 95); Kena Decl., ¶ 8 & Att. D (Appx., 547-48, 559-569); Lescalleet Decl., ¶ 11 (Appx., 596-97); Lombardi Decl., ¶ 6 (Appx., 723-24).

[10] Bedus Decl., ¶ 18 (Appx., 5); Bialoglovski Decl., ¶¶ 8-13 (Appx., 96-97); Cadoy Decl., ¶ 14 (Appx., 125-26); Cannon Decl., ¶¶ 10, 12, 14, 18, 21, 23, 26, 29, 31, 33, 35, 38, 40, 43 (Appx., 225-31); Flores Decl., ¶ 9 (Appx., 398-99); Garrison Decl., ¶¶ 12, 14 (Appx., 431-32); Gionfriddo Decl., ¶ 11 (Appx., 448); Gloudemans Decl., ¶¶ 11, 14 (Appx., 477-78); Kavney Decl., ¶ 14 (Appx., 509); Kena Decl., ¶¶ 9-10 (Appx., 548); Lescalleet Decl., ¶¶ 14, 17-20 (Appx., 597-99);

Defendants provide little to none of the agreed-upon services in return.[11]  Instead Defendants simply string the consumer along for as long as they will continue to make payments, often claiming that their process has been delayed by the COVID-19 pandemic or that they are still working to finalize the loan modification. Eventually, the consumer realizes that no home mortgage modification is forthcoming and often demands a refund, at which point Defendants and their agents simply stop responding to the consumer.[12]

### B.  Defendants Prey on Financially Distressed Homeowners

Defendants' schemes often target those homeowners who are already struggling to make their mortgage payments.  Defendants frequently extract thousands of dollars from consumers who recently lost their job,[13] are experiencing a medical emergency,[14] or subsist on a fixed income.[15] Multiple consumers also declare that they lost jobs and income (and thus, struggled to make their mortgage

---

Lombardi Decl., ¶¶ 12-13, 16-22 (Appx., 725-28); Williams Decl., ¶¶ 12-13, 18, 27 (Appx., 823, 825, 827); Willis Decl., ¶ 8 (Appx., 889).

[11] Bedus Decl., ¶¶ 19-35 (Appx., 5-9); Bialoglovski Decl., ¶¶ 14-16 (Appx., 98); Cannon Decl., ¶¶ 17-45 (Appx., 226-32); Flores Decl., ¶¶ 10-13 (Appx., 399-400); Garrison Decl., ¶¶ 16-25 (Appx., 432-34); Gionfriddo Decl., ¶¶ 12-18 (Appx., 448-51); Gloudemans Decl., ¶¶ 15-17 (Appx., 478-79); Kavney Decl., ¶ 18 (Appx., 510); Kena Decl., ¶¶ 11-19 (Appx., 548-50); Lescalleet Decl., ¶¶ 21-24 (Appx., 599-604); Lombardi Decl., ¶¶ 24-32 (Appx., 728-30); Williams Decl., ¶ 28 (Appx., 827-28).

[12] Bedus Decl., ¶¶ 30-32, 35 (Appx., 8-9); Copeland Decl., ¶¶ 23-24 (Appx., 366); Gloudemans Decl., ¶¶ 17-18 (Appx., 479); Kavney Decl., ¶ 19 (Appx., 511); Kena Decl., ¶ 19 (Appx., 550); Lescalleet Decl., ¶ 24 (Appx., 604).

[13] Kena Decl., ¶ 2 (Appx., 546); Lescalleet Decl., ¶ 3 (Appx., 595); Willis Decl., ¶ 2 (Appx., 887).

[14] Bedus Decl., ¶ 4 (Appx., 1); Garrison Decl., ¶ 3 (Appx., 429); Lombardi Decl., ¶ 3 (Appx., 723); Willis Decl., ¶ 2 (Appx., 887).

[15] Cannon Decl., ¶ 3 (Appx., 223); Flores Decl., ¶ 3 (Appx., 397); Garrison Decl., ¶ 3 (Appx., 429); Gloudemans Decl., ¶ 2 (Appx., 475); Maestas Decl., ¶ 3 (Appx., 770).

payments) due to the COVID-19 pandemic.[16]  Defendants expressly target these types of consumers in their marketing and sales materials.  For example, one of the websites operated by Defendants includes a promotional video in which a fictional consumer states "I was way back on my mortgage payments due to this pandemic. . . . [I was] in a severe depression, in crisis.  Then I found Academy Home Services.  They were working with COVID Care forgiveness plans 'slash' government-backed hardship program.  [*sic*] . . . They didn't only help me to get the best interest rate with lower mortgage payments, which are way too affordable, my past dues were forgiven . . ."  Ex. E (Appx., 1107).  Multiple consumers similarly declare that Defendants touted their affiliation with government-run relief programs as part of their sales pitch.[17]

Plaintiffs have received more than 200 consumer complaints regarding these illicit activities and Defendants are believed to have misappropriated more than $6.6 million.  Solares Decl., ¶ 42 (Appx., 1075); Borden Decl., ¶ 36 (Appx., 976).

**C.   State Agencies Attempt to Prosecute Defendants Without Success**

Defendants' actions have not gone unnoticed, however, as state regulators have sought to deter Defendants' illegal conduct.  To date, Defendants have been the subject of lawsuits and administrative orders in at least six different states:

| Action | Outcome |
|---|---|
| **Ohio (2017).**  The Ohio Attorney General sues Ahiga and his entities in Ohio state court for violating state | After Ahiga fails to appear, the Ohio court enters a default judgment, bans Ahiga from offering mortgage |

---

[16] Bialoglovski Decl., ¶ 3 (Appx., 95); Gionfriddo Decl., ¶ 3 (Appx., 445); Gloudemans Decl., ¶ 4 (Appx., 475).

[17] Bedus Decl., ¶ 5 (Appx., 1); Copeland Decl., ¶ 4 (Appx., 362); Gionfriddo Decl., ¶ 4 (Appx., 445); Garrison Decl., ¶ 5 (Appx., 429-30); Gloudemans Decl., ¶ 4 (Appx., 475); Kavney Decl., ¶ 5 (Appx., 506); Kena Decl., ¶ 4 (Appx., 546); Lescalleet Decl., ¶¶ 4-6 (Appx., 595); Maestas Decl., ¶ 5 (Appx., 770-71).

| | |
|---|---|
| consumer protection laws in operating a mortgage assistance relief services scam. Ex. F (Appx., 1109-116). | assistance relief services in Ohio, and orders him to pay $90,466.53 in restitution and civil penalties. Ex. G (Appx., 1118-127). |
| **Washington (2020).** The Washington Department of Financial Institutions opens an administrative action against Ahiga, Dyer, and Infocom Entertainment for violating state consumer protection laws as part of a mortgage assistance relief services scheme. Ex. H (Appx., 1129-141). | After the defendants fail to appear, the Department bans the defendants from offering mortgage assistance relief services and orders them to pay $8,848 in restitution and civil penalties. Ex. H (Appx., 1129-141). |
| **Oregon (2020).** The Oregon Department of Consumer and Business Services opens an administrative action against Ahiga and Infocom Entertainment for violating state consumer protection laws as part of a mortgage assistance relief services scheme. Ex. I (Appx., 1143-49) | After the defendants fail to appear, the Department orders the defendants to pay $28,186.99 in civil penalties and restitution and cease and desist from further violations. Ex. I (Appx., 1143-49). |
| **Connecticut (2020).** The Connecticut Banking Commissioner opens an administrative action against Dyer and Infocom Entertainment for violating state consumer protection laws in connection with a mortgage assistance relief services scam. Ex. J (Appx., 1151-57). | After the defendants fail to appear, the Commissioner enters an order directing them to pay $200,000 in civil penalties and cease and desist from further violations. Ex. J (Appx., 1151-57). |

| | |
|---|---|
| **North Carolina (2021).**  The North Carolina Attorney General sues Ahiga in North Carolina state court for violating state consumer protection laws in connection with a mortgage assistance relief services scheme.  Ex. K (Appx., 1159-172). | After Ahiga fails to appear, the North Carolina court enters a default judgment ordering him to pay $20,046 in restitution and civil penalties and banning him from offering mortgage assistance relief services.  Ex. L (Appx., 1174-78). |
| **California (2021).**  The California State Bar opens an investigation into "Home Matters USA" for engaging in the unauthorized practice of law in connection with mortgage assistance relief services.  Ex. M (Appx., 1180-81). | After the company fails to respond, the California State Bar directs the company to cease and desist from engaging in the practice of law in connection with mortgage assistance relief services.  Ex. N (Appx., 1182-87). |

### D.    In an Effort to Avoid Liability, Defendants Dissolve The Existing Entities and Assume New Identities to Continue the Scam

As the list of regulatory actions against them has grown longer, Defendants have taken additional steps to attempt to conceal their identities and avoid liability.

Over a period of two years, Dyer and Ahiga began dissolving their existing corporate entities.  Solares Decl., ¶ 19 (Appx., 1067); Ex. U (Appx., 1226) (February 2020 Certificate of Dissolution filed by Dyer for Infocom Entertainment); Ex. T (Appx., 1219) (September 2021 Certificate of Dissolution filed by Ahiga for Apex Consulting); Ex. R (Appx., 1208) (February 2022 Certificate of Dissolution filed by Dyer for South West Consulting).  Despite purportedly dissolving these entities, Dyer and Ahiga continue to conduct business through the entities and their fictitious business names.  For example, these purportedly dissolved entities have continued to contact consumers and receive consumer payments.  *See* Copeland Decl., ¶¶ 15-23 (Appx., 364-66) (consumer

-8-

communicated with sales staff and made payments to "Golden Home Services America" for months following the dissolution of Apex Consulting); Lescalleet Decl., ¶¶ 17-20 (Appx., 598-99) (consumer directed to continue making payments to "Atlantic Pacific Service" following the dissolution of Infocom Entertainment).

Defendants have also adopted new identities to continue operating their scam. Most notably, in October 2020, Ahiga petitioned the Los Angeles Superior Court to change his legal name from "Michael Dominic Grinnell" to "Dominic Ahiga," and his request was granted in February 2021. Exs. O-P (Appx., 1189-192). In July 2021, Ahiga formed Defendant Green Equitable Solutions and begun marketing Defendants' mortgage assistance relief scam to consumers using that entity. Ex. Q (Appx., 1194); Bedus Decl., ¶ 9 (Appx., 9) ("Academy Home Service" directed consumer to make payments to Green Equitable Solutions); Ex. W (Appx., 1237) (fictitious business name registration statement associating "Academy Home Services" with Green Equitable Solutions).[18] Recently, on July 20, 2022, Defendants dissolved this entity. Ex. Q (Appx., 1201). As before, Plaintiffs believe that Defendants continue to use Green Equitable Solutions (and its fictitious business name, Academy Home Services) to run the scam.

Dyer also recently formed a new entity entitled Equity Relief Funding, Inc. ("Equity Relief Funding"). Ex. V (Appx., 1230-32). Dyer is the sole officer of this new entity and recently launched a website for this entity that is highly similar to one used by Green Equitable Solutions. *Compare* Ex. C (Appx., 1092) *with* Ex. D (Appx., 1094-106). Equity Relief Funding also recently registered to do business as "Atlantic Pacific Services United," "Academy Home Services America," "Home Matters USA Group," and "Golden Home Services United,"

---

[18] Ahiga initially identified himself as the sole officer of this new entity but subsequently filed documents with the Secretary of State transferring these roles to two individuals who received regular payments from Defendants. Solares Decl., ¶ 34 (Appx., 1072-73); Ex. Q (Appx., 1195-1200).

which are essentially the same names as ones previously used by the Corporate
Defendants.  Ex. X (Appx., 1244, 1253, 1262, 1266, 1278).  Plaintiffs therefore
believe that this new entity is being used to continue the scam.

## III.   ARGUMENT

Issuance of an *ex parte* temporary restraining order is appropriate here where
the evidence shows that Plaintiffs are likely to succeed on the merits and the
presumptive harm to the public from the ongoing fraud outweighs any hardship
Defendants may face from halting their deceptive enterprise.  *Ex parte* relief is also
necessary here given Defendants' track record of evading prior adverse rulings
while continuing to operate businesses that are permeated with illegal activity.

### A.   Issuance of an *Ex Parte* Temporary Restraining Order is Appropriate

The FTC Act authorizes this Court to enjoin practices that violate the laws
enforced by the FTC.  15 U.S.C. § 53(b); 15 U.S.C. § 57b.[19]  Incident to this
authority, the Court has the inherent equitable power to grant all temporary and
preliminary relief necessary to effectuate final relief including "any ancillary relief
necessary to accomplish complete justice." *FTC v. Commerce Planet, Inc.,* 815
F.3d 593, 598 (9th Cir. 2016).[20]  This ancillary relief includes the issuance of a
temporary restraining order, an asset freeze, expedited discovery, the appointment
of a receiver, a preliminary injunction, and other remedies.  *See e.g., FTC v. Am.
Nat'l Cellular, Inc.,* 810 F.2d 1511, 1512 (9th Cir. 1987) (granting temporary
restraining order and preliminary injunction including asset freeze and a receiver).

---

[19] The CCFPL authorizes similar injunctive relief with respect to actions brought
by the DFPI.  Cal. Fin. Code § 90012(a) (authorizing the DFPI to take any action
authorized by the CCFPL against covered persons engaged in unfair, deceptive, or
abusive acts and practices with respect to consumer financial products or services);
§ 90012(b) (allowing the DFPI to seek broad relief, including without limitation,
"limits on the activities or functions of the person.").

[20] Unless otherwise indicated, all internal case citations and quotations are omitted.

In determining whether to grant preliminary relief, the Court considers two factors: (1) the likelihood of ultimate success on the merits, and (2) whether the public equities outweigh any private equities.  *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999).  Unlike private litigants, Plaintiffs do not need to prove irreparable injury, *see id.*, which is presumed in a statutory enforcement action.  *FTC v. World Wide Factors, Ltd.,* 882 F.2d 344, 347 (9th Cir. 1989).  As set forth herein, Plaintiffs demonstrate that they will succeed on the merits of their claim that Defendants violate the FTC Act, the MARS Rule, the CCPA, the TSR, and the CCFPL and that the equities weigh heavily in Plaintiffs' favor.

### 1. Plaintiffs Have Established a Strong Likelihood of Success

#### a. Defendants Violate the FTC Act

Defendants have violated, and continue to violate, Section 5(a) of the FTC Act, which prohibits deceptive acts or practices in or affecting commerce.  An act or practice is deceptive if "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."  *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).  "[P]roof of individual reliance by each purchasing customer is not needed" to prove a violation of the FTC Act.  *FTC v. Figgie Intern., Inc.,* 994 F.2d 595, 605 (9th Cir. 1993).  Rather, "[e]xpress claims, or deliberately made implied claims, used to induce a purchase are presumed to be material" and "[c]onsumer reliance on express claims is presumed reasonable." *FTC v. Universal Premium Servs., Inc.*, No. 06-cv-849, 2007 WL 9728965, at *2 (C.D. Cal. Feb. 21, 2007); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988).  And there is no requirement that the Defendants acted with intent to deceive or in bad faith in making the representations.  *See FTC v. Verity Intern., Ltd.,* 443 F.3d 48, 63 (7th Cir. 2006); *Feil v. FTC,* 285 F.2d 879, 896 (9th Cir. 1960).  Against this backdrop, Plaintiffs are likely to succeed on all three of the elements required to prove a violation of the FTC Act.

First, Defendants make false representations to consumers by promising them that they will obtain home mortgage modifications that will lower their interest rate and/or principal amount, resulting in lower monthly payments.  For example, Defendants expressly represented to Cynthia Gionfriddo that they would be able to lower her home mortgage interest rate from 8.2% to 2.0675%, amounting to nearly $19,000 in annual savings.  Gionfriddo Decl., ¶ 8 & Att. A (Appx., 446-47, 453-58).  Defendants made similar representations to numerous other consumers as well.[21]  Defendants also make a litany of other related false representations including (1) that consumers' homes cannot be foreclosed on while they work with Defendants, (2) that Defendants will refund their money upon request, (3) that Defendants are able to secure mortgage relief as part of a government benefit related to the COVID-19 pandemic, and/or (4) that consumers need not make their monthly mortgage payments.  *See* Section II.A.

Second, it is beyond dispute that each of these representations are false and would mislead a consumer acting reasonably under the circumstances.  Numerous consumers declare that they did not receive a lower interest rate or lower monthly payments in connection with their payments to Defendants.[22]  If anything, several

---

[21] Bialoglovski Decl., ¶¶ 4, 6, & Att. A (Appx., 95-96, 101-05) (offer to lower interest rate from 4.125% to 2.125%); Cannon Decl., ¶¶ 4, 7, & Att. A (Appx., 223-24, 234-42) (3.25% to 2.125%); Flores Decl., ¶¶ 4-5, 8, & Att. A (Appx., 397-98, 403-09) (6.240% to 2.25%); Gloudemans Decl., ¶ 4 & Att. A (Appx., 475, 481-86) (5.25% to 2.0625%); Kena Decl., Att. D (Appx., 559-69) (3.75% to 3%); Lescalleet Decl., ¶ 13 & Att. E (Appx., 597, 663-70) (3.375% to 2.125%); Lombardi Decl., ¶¶ 6, 8, & Att. B (Appx., 723-24, 736-42) (4.875% to 2.0675%).

[22] Bialoglovski Decl., ¶ 16 (Appx., 98) ("I paid Home Matters $16,157.15 over six months and received nothing in return."); Cannon Decl., ¶ 46 (Appx., 232) ("I had been paying Home Matters for over a year[] and they had not provided the services they promised me."); Cadoy Decl., ¶ 23 (Appx., 129) ("I paid Home Matters $58,447.55 for their services, and ultimately was not provided with the loan modification they promised."); Flores Decl., ¶ 13 (Appx., 400) ("I paid Home

consumers state that their payments actually increased due to missed payment penalties, that their homes were now in risk of foreclosure, and/or that their credit scores had been harmed due to Defendants' misrepresentations.[23]  Likewise, there is (and was) no basis for Defendants' representations regarding the risk of foreclosure, promised refunds, COVID-19 government benefits, or their directions to consumers to cease payment on their mortgages.[24]  And, as set forth above, many of the consumers contacted by Defendants were experiencing financial distress, making them particularly receptive to Defendants' false promises of mortgage assistance.  Moreover, because the representations made by Defendants were express, it is presumed that consumers were acting reasonable in relying upon them.  *Universal Premium Servs.*, 2007 WL 9728965, at *2; *World Travel*

---

Matters $20,065, and they provided me nothing in return."); Lescalleet Decl., ¶ 24 (Appx., 604) ("I wanted APS to refund the $7,952.81 I paid because APS did not provide me with any of the services it promised.").

[23] Cannon Decl., ¶ 47 (Appx., 232) ("I attempted to re-start [monthly mortgage] payments to my lender, but they are [] currently only willing to accept the full pay-off amount"); Cadoy Decl., ¶ 24 (Appx., 129-30) ("I did not pay my mortgage for over a year because Home Matters was taking the money I would have used to pay my mortgage to pay for their services.  I am now much further behind on my mortgage than I was when I first started working with Home Matters[.]"); Gloudemans Decl., ¶ 19 (Appx., 479); Kena Decl., ¶ 18 (Appx., 550) ("[T]he amount of my monthly mortgage payments actually increased because I missed payments by following APS's direction not to pay my mortgage."); Lescalleet Decl., ¶ 25 (Appx., 604) ("I currently owe over $175,000.00 in back payments and penalties for having stopped making my monthly mortgage payments as instructed by APS."); Lombardi Decl., ¶ 33 (Appx., 730-31) ("my monthly mortgage payments have increased [] to make up for the past due payments . . . I have also received more than one notice [stating] my home might be foreclosed upon").

[24] Bialoglovski Decl., ¶ 16 (Appx., 98) ("Home Matters subsequently ignored my requests for a refund[] despite their initial promises to provide one . . ."); Gionfriddo Decl., ¶ 16 (Appx., 449-50) (consumer discovered she was at risk of foreclosure proceedings due to Defendants' instruction not to communicate with mortgage servicer); Kena Decl., ¶ 15 (Appx., 549) (consumer's home placed in foreclosure after following Defendants' instruction not to make payments).

*Vacation*, 861 F.2d at 1029.  Thus, each of these representations were false and misleading to consumers acting reasonably under the circumstances.

Third, these misrepresentations are plainly material to consumers.  As the Ninth Circuit has explained, express representations to consumers are "presumed to be material." *Pantron I*, 33 F.3d at 1096.  And representations are material if they involve "information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product." *Kraft, Inc. v. FTC,* 970 F.2d 311, 322 (7th Cir. 1992); *see also FTC v. Mortgage Relief Advocates LLC,* No. 14-cv-5434, 2015 WL 11257575, at *2 (C.D. Cal. July 1, 2015) (similar in connection with mortgage assistance relief services specifically).  Here, in addition to the presumption of materiality, multiple consumers affirmatively declare that they were swayed by Defendants' representations.[25]  And Defendants made a point to target those consumers who were interested in government programs, thus heightening the materiality of their representations even further.[26]

Thus, Plaintiffs are likely to succeed in showing violations of the FTC Act.

### b.   Defendants Violate the MARS Rule

Defendants are also violating several provisions of the MARS Rule.

---

[25] Lescalleet Decl., ¶¶ 4-5 (Appx., 595) (consumer "looked specifically for companies that said they were affiliated with [mortgage assistance relief] government programs"); Willis Decl., ¶ 2 (Appx., 887) (Defendants' offers of mortgage assistance relief "sounded like the relief we needed").

[26] Garrison Decl., ¶¶ 3, 5 (Appx., 429-30) (Defendants were specifically "contacting homeowners who might qualify for their 'hardship loan' program"); Gionfriddo Decl., ¶¶ 3, 4 (Appx., 445) (consumer who lost income due to COVID-19 pandemic told that she could lower her home mortgage payments "as part of a government program launched in response to the COVID-19 pandemic."); Lescalleet Decl., ¶ 5 (Appx., 595) (consumer believed Defendants would be able "to lower [his] monthly mortgage payments through federal government programs.").

First, Defendants have illegally charged consumers advanced fees.  Under the MARS Rule, Defendants are prohibited from requesting or receiving "payment of any fee or other consideration until the consumer has executed a written agreement between the consumer and the consumer's loan holder or servicer that incorporate the offer that the provider obtained from the loan holder or servicer." 12 C.F.R. § 1015.5(a).  Yet Defendants repeatedly did just that and extracted large upfront fees while providing nothing in return.[27]

Second, Defendants have illegally represented to numerous consumers that they cannot and should not contact their lenders or servicers while paying for Defendants' "services."  The MARS Rule prohibits Defendants from "[r]epresenting, expressly or by implication . . . that a consumer cannot or should not contact or communicate with his or her lender or servicer." 12 C.F.R. § 1015.3(a).  However, multiple consumers declare that Defendants made such representations to them as part of the sales process, and consumers experienced significant negative consequences due to these representations.[28]

Third, Defendants have made numerous misrepresentations in connection with providing mortgage assistance relief services.  The MARS Rule prohibits mortgage assistance relief service providers from misrepresenting (1) the

---

[27] Bedus Decl., ¶ 6 (Appx., 1-2); Bialoglovski Decl., ¶¶ 7-12 & Att. B (Appx., 96-97, 107); Cannon Decl., ¶ 46 & Att. A (Appx., 232, 234-42); Copeland Decl., ¶¶ 10-16 & Att. A (Appx., 363-65, 368); Flores Decl., ¶¶ 9, 13 & Att. A (Appx., 398-400, 403-09); Gionfriddo Decl., ¶¶ 9, 11, & Att. B (Appx., 447-48, 460-61); Gloudemans Decl., ¶ 14 & Att. A (Appx., 478, 481-86); Kena Decl., ¶¶ 8-10 & Att. D (Appx., 547-48, 559-569); Lescalleet Decl., ¶ 24 & Att. E (Appx., 604, 663-670).

[28] Bedus Decl., ¶¶ 8, 28, 33-35 (Appx., 2, 8-9) (fees incurred and credit score dropped due to instruction not to communicate); Cannon Decl., ¶¶ 5, 47-48 (Appx., 223, 232) (lender demanding full repayment after missing payments); Flores Decl., ¶¶ 7, 14 (Appx., 398-400) (consumer missing documents due to instruction not to communicate).

-15-

likelihood of obtaining mortgage loans modifications for consumers that will make their payments substantially more affordable; (2) the amount of time it will take to accomplish any represented service or result; (3) any affiliation with, endorsement or approval by, or otherwise association with the United States government, any governmental homeowner assistance plan, and any Federal, State, or local government agency, unit, or department; and (4) the consumer's obligation to make scheduled periodic payments or any other payments pursuant to the terms of the consumer's dwelling loan.  12 C.F.R. § 1015.3(b)(1)-(4).  Yet Defendants regularly made misrepresentations regarding each of such matters.[29]

Fourth, Defendants have failed to make multiple mandatory disclosures that are required under the MARS Rule.  Specifically, the MARS Rule requires mortgage assistance relief service providers to disclose, among other things, that (1) the provider is not associated with the government and is not approved by the government or the consumer's lender, (2) that the lender may not agree to modify the consumer's mortgage, (3) that the consumer is free to stop doing business with the provider at any time and may reject an offer of mortgage modification without penalty, and (4) that a consumer's failure to pay their mortgage could result in the

---

[29] Bedus Decl., ¶ 5 (Appx., 1) (consumer told "that Academy Home could *guarantee* an interest rate of 1.86% and that the federal government would provide a thirty percent (30%) reduction of my mortgage principal as part of a COVID-19 relief program."); Cannon Decl., ¶¶ 7, 46 (Appx., 224, 232) (consumer told process would take only 120 days yet made payments for more than 1 year); Copeland Decl., ¶ 20 (Appx., 365) (consumer told that mounting mortgage balance due would be forgiven under the CARES Act); Flores Decl., ¶¶ 4, 11-13 (Appx., 397, 400) (consumer told process would take only 30-45 days yet made payments for nearly 2 years); Gionfriddo Decl., ¶ 4 (Appx., 445) (told that services were "part of a government program launched in response to the COVID-19 pandemic"); Kena Decl., ¶¶ 3, 18 (Appx., 546, 550) (consumer told that he no longer needed to pay mortgage); Lescalleet Decl., ¶ 11 (Appx., 596-97) ("APS guaranteed to lower my interest rate and monthly mortgage payments in exchange for me paying APS").

consumer losing their home and damaging their credit.  12 C.F.R. § 1015.4(b)(1)-(3), (c).  Multiple consumers declare that they did not receive these disclosures.[30]

Thus, for each of these reasons, Plaintiffs are likely to succeed on the merits of their claim that Defendants have violated the MARS Rule.

### c.    Defendants Violate the CCPA

Defendants have also violated the COVID-19 Consumer Protection Act, which bars Defendants from "engag[ing] in a deceptive act or practice . . . that is associated with . . . (2) a government benefit related to COVID-19."  Public Law 116-260, 134 Stat 1182, Title XIV, Section 1401(b)(2).  As referenced above, Defendants have repeatedly told consumers that their "services" are provided as part of a government benefit related to the COVID-19 pandemic.  For example, a representative from "Golden Home Services America" told a consumer that they would be able to "help[] people lower their home mortgage interest rates and principle amounts as part of a government program launched in response to the COVID-19 pandemic."  Gionfriddo Decl., ¶ 4 (Appx., 445).  Defendants made similar representations to other consumers over the phone and through their websites as well.[31]  Yet there is no evidence that Defendants are associated with a government program or benefit.  Thus, Plaintiffs are likely to succeed here as well.

---

[30] Bedus Decl., ¶ 7 (Appx., 2); Cannon Decl., ¶ 6 (Appx., 224); Flores Decl., ¶ 6 (Appx., 397); Gionfriddo Decl., ¶ 7 (Appx., 446); Kena Decl., ¶ 6 (Appx., 547).
[31] *See* Bedus Decl., ¶ 5 (Appx., 1) (guaranteed lower interest rate and mortgage principal "as part of a COVID-19 relief program"); Gloudemans Decl., ¶ 4 (Appx., 475) (after consumer mentioned being impacted by the COVID-19 pandemic, representative claimed association with a "government-funded program"); Maestas Decl., ¶ 5 (Appx., 770-71) ("[T]hey guaranteed that Home Matters would get me into the COVID-19 government program."); Russo Decl., ¶ 3 (Appx., 818) ("The representative told me that I was eligible for a government program to help homeowners impacted by COVID-19 that would give me a lower interest rate on my mortgage and lower my monthly payment by half."); Ex. E (Appx., 1107) (video on Defendants' website touting a COVID-19 relief program).

-17-

### d.    Defendants Violate the TSR

Defendants have also violated the Telemarketing Sales Rule.  In relevant part, the TSR requires telemarketers to pay a fee to access the National Do Not Call Registry and prohibits telemarketers from contacting consumers who have registered their telephone numbers on the National Do Not Call Registry.  16 C.F.R. §§ 310.8, 310.4(b)(1)(iii)(B).  As the administrator for the National Do Not Call Registry, the FTC maintains a registry of telemarketers who have purchased access to the National Do Not Call Registry and has no record of Defendants purchasing such access.  Solares Decl., ¶¶ 53-54 (Appx., 1081-82).  Furthermore, consumers declare that they were contacted by Defendants *despite* being listed on the National Do Not Call Registry.  Gionfriddo Decl., ¶ 5 (Appx., 445) ("I am not sure how GHSA got my phone number or received permission to call me as I had never heard of GHSA before I received the phone call from them and I am on the National Do Not Call List so as to avoid unwanted solicitation calls."); Garrison Decl., ¶ 4 (Appx., 429) (consumer received call despite being on National Do Not Call Registry).  Thus, Plaintiffs are likely to succeed on their TSR claims.

### e.    Defendants Violate the CCFPL

Defendants also violate the California Consumer Financial Protection Law. Cal. Fin. Code § 90000 *et seq.*  The law, which went into effect on January 1, 2021, prohibits certain "covered persons" from engaging "in any unlawful, unfair, deceptive, or abusive act or practice with respect to consumer financial products or services."  Cal. Fin. Code § 90003(a)(1).  Included in the law's definition of "financial product or service" is "providing services to assist a consumer with . . . modifying the terms of any extension of credit[] or avoiding foreclosure."  Cal. Fin. Code § 90005(k)(8)(B).  As described in greater detail above, Defendants have engaged in unlawful and deceptive conduct relating to consumer financial products or services, to wit, providing services to assist consumers with modifying extensions of credit or avoiding foreclosure, by violating the FTC Act, the MARS

Rule, the CCPA, and the TSR.  *See* Section III.A.1.i-iv.  Thus, to the extent that Plaintiffs are likely to succeed in showing a violation of any of the above federal laws or regulations, Plaintiffs are also likely to succeed in showing a violation of the CCFPL.  *See Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000) (interpreting a similar statute and holding that the prohibition against "unlawful" conduct "borrows violations of other laws and treats them as unlawful practices that the [] law makes independently actionable").

### f.      Defendants Act as a Common Enterprise

Plaintiffs are also likely to succeed in showing that Defendants have acted as a common enterprise.  "Where one or more corporate entities operate in common enterprise, each may be held liable for the deceptive acts and practices of the others."  *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012).  In making this determination, the Court looks to four factors: "(1) common control; (2) sharing office space and offices; (3) whether business is transacted through a 'maze of interrelated companies'; and (4) commingling of funds."  *Id.*  Each factor favors the finding of a common enterprise here.

First, the Individual Defendants exercise common control over each of the Corporate Defendants.  Each of the Corporate Defendants was created (and, in relevant part, dissolved) by the same two Individual Defendants, and those two individuals were, with one exception, the only officers of the Corporate Defendants throughout their existence.  Exs. Q-V (Appx., 1194-1233) (incorporation and dissolution paperwork for each of the Corporate Defendants).[32]  The Individual Defendants have also opened, maintained, and closed financial accounts for each

---

[32] The sole exception concerns Green Equitable Solutions.  While Ahiga served as the sole officer of this entity at the time of incorporation, he subsequently transferred that role to two individuals who are believed to be his employees.  Solares Decl., ¶ 34 (Appx., 1072-73); Ex. Q (Appx., 1195-1200).

of the Corporate Defendants, and regularly make personal cash withdrawals from those accounts.  Solares Decl., ¶¶ 30, 32-33 (Appx., 1069-070, 1072).

Common control is also evidenced by the fact that the Corporate Defendants operate substantially the same mortgage assistance scheme regardless of the name that they are using.  *See* Section II.A.  The Corporate Defendants have used almost identical advertising, marketing, and other communications directed at consumers such as similar pamphlets, emails, and contracts.  As just one example, Defendants regularly present consumers with essentially the same "offer packet" of initial documents to complete without regard as to what corporate entity the consumer is actually interacting with or the fictitious business name being used. *Compare* Cannon Decl., Att. A (Appx., 234-42) ("Home Matters USA Offer" packet used by South West Consulting) *with* Gionfriddo Decl., Att. A (Appx., 453-58) ("Golden Home Services Offer" packet used by Apex Consulting) *with* Lescalleet Decl., Att. E (Appx., 663-70) ("Atlantic Pacific Service Offer" packet used by Infocom Entertainment).  And at least Defendants South West Consulting and Apex Consulting advertised their "services" to consumers using essentially identical websites.  *Compare* Ex. A (Appx., 1084-86) ("Home Matters USA" website) *with* Ex. B (Appx., 1088-090) ("Golden Home Services America" website).

Second, the Corporate Defendants regularly share addresses and office space.  Defendants regularly utilize "virtual" offices at which they receive mail and payments from consumer victims.  Based on financial records and shipping documents obtained to date, Plaintiffs have identified the following addresses that have been shared by one or more of the Corporate Defendants:

| Address | Defendants Who Used The Address |
| --- | --- |
| 3580 Wilshire Boulevard Los Angeles, CA | South West Consulting Enterprises, Inc. |
| | Apex Consulting & Associates Inc. |
| | Infocom Entertainment Ltd, Inc. |
| 3435 Wilshire Boulevard | South West Consulting Enterprises, Inc. |

| Los Angeles, CA | Apex Consulting & Associates Inc. |
| 27201 Puerta Real | Green Equitable Solutions |
| Mission Viejo, CA | South West Consulting Enterprises, Inc. |

Solares Decl., ¶ 37 (Appx., 1073); Borden Decl., ¶¶ 31-34 (Appx., 974-975).

Third, the Corporate Defendants operate as interrelated companies.  As described above, the Corporate Defendants are owned and operated essentially exclusively by the Individual Defendants and utilize substantially the same marketing materials to facilitate their deceptive scam.  Additionally, the Corporate Defendants blur corporate distinctions when interacting with consumers.  For example, the Corporate Defendants frequently re-use the same fictitious business names when interacting with consumers.  In October 2021, Ahiga registered the names "Academy Home Service" and "Academy Home Services" as fictitious business names for both South West Consulting and Green Equitable Solutions.  Ex. W (Appx., 1235-241).  Defendants also use the names "Academy Home Services" (plural) and "Academy Home Service" (singular) interchangeably within the same corporate website.  Ex. D (Appx., 1094-106).  Likewise, Apex Consulting and South West Consulting have registered to do business as "Home Matters USA" and "Home Matters USA Consulting."  Ex. X (Appx., 1264, 1268).

Fourth, Defendants comingle funds as part of the common enterprise.  As one example, consumers who are solicited by one entity are often asked to submit their monthly upfront payments to a different entity.  Gionfriddo Decl., ¶ 11 (Appx., 448) (consumer approached by Apex Consulting but made payments to South West Consulting); Williams Decl., ¶ 12 (Appx., 823) (same); Borden Decl., ¶ 17 (Appx., 971) (undercover investigator contacted Home Matters USA but thereafter was solicited by Golden Home Services America via text message).  Similarly, Defendants frequently opened bank accounts using essentially all of their fictitious business names and then deposited consumer funds into those accounts without regard as to which entity the consumer intended to pay.  For

-21-

1   example, Defendants opened bank accounts at JPMorgan Chase in the name of

2   "South West Consulting d/b/a Golden Home Services of America Enterprises,

3   d/b/a Home Matters USA, d/b/a Atlantic Pacific Service Group." Ex. AA (Appx.,

4   1372, 1375, 1337). Yet, deposited dozens of checks and wire transfers from

5   consumers who thought they were paying other entities such as "Atlantic Pacific

6   Service" or "Golden Home Services America," which are fictitious business names

7   used by Infocom Entertainment and Apex Consulting respectively, not South West

8   Consulting. *See e.g.,* Ex. AA (Appx., 1390, 1392, 1505).

9       In short, all four factors weigh strongly in favor of a finding of common

10   enterprise, and Plaintiffs are likely to succeed in showing a common enterprise.

11       **g.**    **The Individual Defendants are Personally Liable**

12       The Individual Defendants are also personally liable. Individual liability

13   exists where "(1) the corporation committed misrepresentations of a kind usually

14   relied on by a reasonably prudent person and resulted in consumer injury, and (2)

15   individuals participated directly in the violations or had authority to control the

16   entities." *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1101 (9th Cir. 2014).

17   Restitution is appropriate where the defendants "had actual knowledge of material

18   misrepresentations, was recklessly indifferent to the truth or falsity of a

19   misrepresentation, or had an awareness of a high probability of fraud along with an

20   intentional avoidance of the truth." *Id.* at 1101-02. However, Plaintiffs "need not

21   show that a defendant intended to defraud consumers" and "the extent of an

22   individual's involvement in a fraudulent scheme alone is sufficient to establish the

23   requisite knowledge for personal restitutionary liability." *Id.* at 1102.

24       Each of these requirements is met here. First, as demonstrated above, the

25   Individual Defendants have used the Corporate Defendants as a means to

26   promulgate misrepresentations regarding mortgage assistance relief services that

27   have resulted in upwards of $6.3 million in harm to consumers. *See* Section

28   III.A.1. Second, the Individual Defendants had authority to control the Corporate

-22-

Defendants.[33]   As referenced above, the Individual Defendants are solely responsible for the creation, control, and dissolution of the Corporate Defendants and, with a sole exception concerning Green Equitable Solutions, have served as the only officers of the Corporate Defendants for their entire existence.  *See* Section III.A.2.  Third, at a minimum, the Individual Defendants have acted with reckless indifference as to the truth or falsity of their misrepresentations given that they have simply ignored at least six different regulatory lawsuits against them concerning the same misrepresentations.  *See* Section II.B.  This conclusion is further bolstered by the fact that the Individual Defendants have repeatedly changed the names of their business entities and, in all but one case, have dissolved them in roughly the same time period that they were being sued by other regulators.  *See* Section II.C.  Thus, Plaintiffs are likely to succeed here as well.

### 2.    The Balance of Equities Tips Strongly in Plaintiffs' Favor

Issuance of a temporary restraining order is also justified given the balance of equities in this case.  Defendants are private individuals and business entities that are engaged solely in illegal activities.  *See* Section III.A.2.  Thus, the Court should afford no weight to any interest in continuing Defendants' illegal business activities.  *FTC v. World Wide Factors Ltd.,* 882 F.2d 344, 347 (9th Cir. 1989).  Conversely, the public has a strong interest in preserving the Court's ability to order a meaningful remedy for Defendants' illegal practices, including restitution for consumers.  As the Ninth Circuit has explained "[h]arm to the public interest is presumed" in a statutory enforcement action.  *Id.* at 346.  Thus, the public interest in preserving assets and evidence outweighs any interest Defendants may have in keeping ill-gotten gains and operating their illegal businesses.

---

[33] There is also some evidence to suggest that the Individual Defendants have personally participated in the violations by creating websites related to the scam, participating in telephone calls with consumers, and receiving payments.  *See* Bedus Decl., ¶¶ 25-26 (Appx., 7); Garrison Decl., ¶ 21 (Appx., 433-34).

**B.**     **Issuance of an *Ex Parte* Temporary Restraining Order is Necessary to Provide Final Effective Relief**

*Ex parte* relief is also appropriate given Defendants' history of ignoring court orders, concealing their identities, and hiding assets. *See* Section II.B. Given Defendants' past behavior, they are almost certain to dissipate assets and destroy evidence in response to notice of a temporary restraining order. As explained in the FTC's Rule 65 certification, defendants in cases like this one routinely attempt to thwart court orders by absconding with assets and destroying evidence. *See* Freeman Rule 65(b)(1) Decl., ¶ 22. Recognizing this, courts in the Central District have granted numerous orders similar to the Proposed Temporary Restraining Order submitted here. *See FTC v. American Home Servicing Center, LLC,* No. 18-cv-597, Dkt. 20 (C.D. Cal. Apr. 13, 2018); *FTC v. Good EBusiness LLC,* No. 16-cv-1048, Dkt. 12 (C.D. Cal., Feb. 16, 2016). Plaintiffs highlight the following provisions as being particularly necessary in this case:

**Asset Freeze.** An asset freeze is necessary to preserve the possibility of restitution. *Johnson v. Couturier,* 572 F.3d 1067, 1085 (9th Cir. 2009) ("A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover damages, if relief is not granted."). Illicit activities like those here "lead to the conclusion that, absent a freeze, [defendants] would dispose of, or conceal, or send abroad, all of the moneys they have obtained." *FTC v. H.N. Singer,* 668 F.2d 1107, 1113 (9th Cir. 1982). As the Ninth Circuit has explained, "the public interest in preserving the illicit proceeds . . . for restitution to the victims is great." *FTC v. Affordable Media,* 179 F.3d 1228 (9th Cir. 1999).

Here, multiple considerations support the issuance of an order freezing Defendants' assets. Defendants regularly withdraw substantially all of the funds in their bank accounts, which substantially decreases the likelihood that Plaintiffs will be able to trace assets for purposes of a subsequent recovery for consumers. Solares Decl., ¶¶ 32-33 (Appx., 1072). Furthermore, Defendants have a track

-24-

1   record of ignoring judgments against them, which suggests that they will seek to

2   avoid complying with any judgment entered here absent a freeze of their assets.

3   *See* Section II.B.  Finally, absent a freeze, Defendants are likely to continue

4   dissipating assets on expenditures such as leads for future "customers" and

5   document shredding services.  Solares Decl., ¶ 33 (Appx., 1072).

6       **Expedited Discovery.**  Rule 26(d) authorizes the Court to order expedited

7   discovery.  Such discovery is necessary here to allow Plaintiffs to identify, locate,

8   and secure any assets and business records that they have been unable to locate to

9   date so as to ensure the Court's ability to order effective relief at the conclusion of

10  this case.  Courts in this district have regularly authorized such relief.  *FTC v.*

11  *Wealth Educators, Inc.*, No. 15-cv-2357, 2015 WL 11439063, at *8 (C.D. Cal.

12  Apr. 6, 2015); *Mortgage Relief Advocates*, 2014 WL 12479398, at *2.

13      **Appointment of a Receiver.**  The appointment of a temporary receiver over

14  Defendants is also necessary if assets are to be preserved for consumer redress.

15  When a corporate defendant has deceived members of the public, "it is likely that

16  in the absence of the appointment of a receiver to maintain the status quo, the

17  corporate assets will be subject to diversion and waste," further harming the

18  victims of the scam.  *SEC v. First Fin. Grp.,* 645 F.2d 429, 438 (5th Cir. 1981).  A

19  temporary receiver will preserve evidence about the scope of Defendants' fraud

20  and maximize the relief available for consumers.  Courts in this district routinely

21  appoint temporary receivers in such cases.  *American Home Servicing,* No. 8:18-

22  cv-597, Dkt. 20; *Good EBusiness,* No. 2:16-cv-1048, Dkt. 12.

23  **IV.   CONCLUSION**

24      Defendants have repeatedly demonstrated that they do not intend to satisfy

25  or comply with judgments that are entered against them.  Accordingly—and

26  because Plaintiffs have amply demonstrated a likelihood of success and favorable

27  equities—the Court should enter Plaintiffs' proposed temporary restraining order

28  to ensure that the injured consumers can receive effective final relief.

1

Dated:  September 12, 2022

2

3

MILES D. FREEMAN

4

mfreeman@ftc.gov
KARINA A. LAYUGAN

5

klayugan@ftc.gov
CARLA L. CHEUNG

6

ccheung1@ftc.gov
Federal Trade Commission

7

10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024

8

Tel: (310) 824-4300
Fax: (310) 824-4380

9

*Attorneys for Plaintiff Federal Trade*

10

*Commission*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

TAYLOR STEINBACHER
Taylor.Steinbacher@dfpi.ca.gov
LOUIS LAVERONE
Louis.Laverone@dfpi.ca.gov
California Department of Financial
Protection & Innovation
320 West 4th Street, Suite 750
Los Angeles, CA 90013
Tel: (213) 576-7500
Fax: (213) 576-7181

*Attorneys for Plaintiff California*
*Department of Financial Protection &*
*Innovation*