ANISHA DASGUPTA, General Counsel
MILES D. FREEMAN, Cal. Bar No. 299302
mfreeman@ftc.gov
KARINA A. LAYUGAN, Cal. Bar No. 302049
klayugan@ftc.gov
CARLA L. CHEUNG, Cal. Bar No. 291562
ccheung1@ftc.gov
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Tel: (310) 824-4300
Fax: (310) 824-4380

*Attorneys for Plaintiff Federal Trade Commission*

CLOTHILDE V. HEWLETT, Commissioner
MARY ANN SMITH, Deputy Commissioner
SEAN M. ROONEY, Assistant Chief Counsel
TAYLOR STEINBACHER, Cal. Bar No. 285335
Taylor.Steinbacher@dfpi.ca.gov
LOUIS LAVERONE, Cal. Bar No. 296990
Louis.Laverone@dfpi.ca.gov
California Department of Financial Protection & Innovation
320 West 4th Street, Suite 750
Los Angeles, CA 90013
Tel: (213) 576-7500
Fax: (213) 576-7181

*Attorneys for Plaintiff California Department
of Financial Protection & Innovation*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, *et al.*,<br><br>        Plaintiffs,<br><br>        v.<br><br>GREEN EQUITABLE SOLUTIONS, *et al.*,<br><br>        Defendants. | Case No.  2:22-cv-6499-FLA-MAR<br><br>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>**Hearing Date:** July 14, 2023<br>**Time:** 1:30 PM<br>**Place:** Courtroom 6B |

## NOTICE OF MOTION

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on July 14, 2023 at 1:30 PM or as soon thereafter as the matter may be heard in the above-entitled action before the Honorable Fernando L. Aenlle-Rocha, at the United States District Court for the Central District of California, First Street Courthouse, 350 West 1st Street, Courtroom 6B, 6th Floor, Los Angeles, California 90012, Plaintiffs Federal Trade Commission and the California Department of Financial Protection and Innovation (collectively, "Plaintiffs"), will respectfully move for summary judgment pursuant to Rule 56 against Defendants Michael Robin Nabati ("Nabati"), Armando Solis Barron ("Solis Barron"), Dominic Ahiga ("Ahiga"), Roger Scott Dyer ("Dyer") (collectively, "Defendants"), and MostCap Enterprises Corp ("MostCap") as to all counts alleged in Plaintiffs' First Amended Complaint (Dkt. 43).

This Motion is made following the conference of Plaintiffs' counsel and *pro se* Defendants Dyer and Ahiga on May 30, 2023, 64and the conference between Plaintiffs' counsel and counsel for Nabati and MostCap on June 1, 2023.  As set forth in the Declaration of Miles D. Freeman, despite multiple attempts at contact by email and phone, counsel for Solis Barron did not respond to Plaintiffs' request to meet and confer regarding this motion.

This Motion is based on this Notice of Motion, the Memorandum of Points & Authorities, the declarations and exhibits attached hereto, any supplemental memoranda that may be filed in connection with the Motion, the pleadings and papers on file in this action, and such oral argument and other matters as the Court may properly consider at the hearing of this Motion.

Dated:  June 9, 2023                    Respectfully submitted,

*/s/ Miles D. Freeman*                   */s/ Taylor Steinbacher*
MILES D. FREEMAN                    TAYLOR STEINBACHER

-i-

mfreeman@ftc.gov
KARINA A. LAYUGAN
klayugan@ftc.gov
CARLA L. CHEUNG
ccheung1@ftc.gov
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Tel: (310) 824-4300
Fax: (310) 824-4380

*Attorneys for Plaintiff Federal Trade
Commission*

Taylor.Steinbacher@dfpi.ca.gov
LOUIS LAVERONE
Louis.Laverone@dfpi.ca.gov
California Department of Financial
Protection & Innovation
320 West 4th Street, Suite 750
Los Angeles, CA 90013
Tel: (213) 576-7500
Fax: (213) 576-7181

*Attorneys for Plaintiff California
Department of Financial Protection &
Innovation*

## **TABLE OF CONTENTS**

I.     FACTUAL BACKGROUND & PROCEDURAL HISTORY ........................2

    A.   Defendants Operate a Mortgage Assistance Relief Services Scam...............2

    B.   Plaintiffs File Suit and The Court Issues a Temporary Restraining Order and Preliminary Injunction ...................................................................................4

    C.   The Individual Defendants Admit Their Authority Over the Corporate Defendants ...........................................................................................................5

II.    LEGAL STANDARD.......................................................................................6

III.    ARGUMENT ...................................................................................................7

    A.   It is Undisputed That the Corporate Defendants Violated the FTC Act, the MARS Rule, the TSR, the CCPA, and the CCFPL ...............................................7

    B.   It is Undisputed That the Corporate Defendants Acted as a Common Enterprise .......................................................................................................13

    C.   There is No Genuine Dispute of Material Fact as to the Liability of the Individual Defendants.................................................................................14

    D.   There is No Genuine Dispute of Material Fact That MostCap Received Assets from the Common Enterprise Without a Legitimate Claim to Those Assets ..........................................................................................................21

    E.   The Court Should Enter Plaintiffs' Proposed Permanent Injunction & Order the Defendants to Pay Restitution and Civil Penalties .......................................22

IV.    CONCLUSION...............................................................................................23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ................................................7

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) .........................................................6

*CFPB v. D & D Mktg.,* 2016 WL 8849698 (C.D. Cal. Nov. 17, 2016) .................15

*CFPB v. Gordon,* 819 F.3d 1179 (9th Cir. 2016) ........................................... 17, 19

*DirecTV, Inc. v. Huynh,* 503 F.3d 847 (9th Cir. 2007) ............................................12

*Ecology Recycling Services LLC v. Engineering/remediation Resources Grp, Inc.,* 2022 WL 16963519 (C.D. Cal. July 20, 2022) ......................................................7

*FTC v. ABC Hispana, Inc.,* 2017 WL 3769195 (C.D. Cal. Aug. 28, 2017) ...........23

*FTC v. Colgate-Palmolive Co.,* 380 U.S. 374 (1965).............................................23

*FTC v. Figgie Intern., Inc.,* 994 F.2d 595 (9th Cir. 1993).........................................7

*FTC v. Gill,* 265 F.3d 944 (9th Cir. 2001) .........................................................7, 23

*FTC v. Grant Connect, LLC,* 763 F.3d 1094 (9th Cir. 2014) ..................................14

*FTC v. John Beck Amazing Profits, LLC,* 865 F. Supp. 2d 1052 (C.D. Cal. 2012) ............................................................................................................... passim

*FTC v. Kutzner,* 2017 WL 4685286 (C.D. Cal. Sept. 5, 2017) ................................9

*FTC v. Lake,* 181 F. Supp. 3d 692 (C.D. Cal. Feb. 24, 2016) ................................15

*FTC v. Pantron I Corp.,* 33 F.3d 1088 (9th Cir. 1994) ............................................7

*FTC v. Publishing Clearing House, Inc.,* 104 F.3d 1168 (9th Cir. 1997) ....... passim

*FTC v. Universal Premium Servs., Inc.,* 2007 WL 9728965 (C.D. Cal. Feb. 21, 2007) ........................................................................................................................8

*SEC v. World Capital Markets, Inc.,* 864 F.3d 996 (9th Cir. 2017) ......................21

*T.W. Elec. Service, Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626 (9th Cir. 1987) ........................................................................................................................7

*VLM Food Trading Intern., Inc. v. Illinois Trading Co.,* 811 F.3d 247 (7th Cir. 2016) ......................................................................................................................12

**Statutes**

15 U.S.C. § 57b ..................................................................................22

Cal. Fin. Code § 90003 ......................................................................11

Cal. Fin. Code § 90005 ......................................................................12

Cal. Fin. Code § 90012 ......................................................................22

Public Law 116-260, 134 Stat 1182, Title XIV, Section 1401 ................11

**Rules**

FED. R. CIV. P. 36 ..........................................................................6, 18

FED. R. CIV. P. 56 ...............................................................................6

**Regulations**

12 C.F.R. § 1015.3 ...............................................................................9

12 C.F.R. § 1015.4 ...............................................................................9

12 C.F.R. § 1015.5 ...............................................................................9

16 C.F.R. § 310.4 ...............................................................................10

16 C.F.R. § 310.8 ...............................................................................10

## **MEMORANDUM OF POINTS & AUTHORITIES**

Defendants Michael Nabati, Armando Solis Barron, Dominic Ahiga, and Roger Dyer ran a mortgage assistance relief services scam in which they promised homeowners lower interest rates, reduced principal balances, and loan forgiveness. Thousands of consumers, many of whom were already struggling to afford their mortgage payments, believed these promises and collectively paid Defendants more than $15.8 million in the hopes of obtaining mortgage relief.  But Defendants provided little, if any, such services in return.  Instead, Defendants took those millions of dollars and spent them on personal real estate investments, luxury car purchases, and day-to-day life expenses.  Whenever consumer complaints became too numerous or state regulators caught wind of the scam, Defendants simply dissolved their corporate entities and formed new ones, all while continuing to defraud consumers.

In September 2022, Plaintiffs filed this lawsuit alleging that Defendants' business activities violated the Federal Trade Commission Act, the Mortgage Assistance Relief Services Rule, the Telemarketing Sales Rule, the COVID-19 Consumer Protection Act, and the California Consumer Financial Protection Law. Finding that Plaintiffs had shown a likelihood of success on the merits, the Court entered an *ex parte* temporary restraining order and preliminary injunction that, among other things, froze Defendants' assets, appointed a temporary receiver, and enjoined Defendants from further violations of law.

In the nine months since the Court made these findings, Defendants have done nothing to contest them.  The Corporate Defendants—despite being owned and controlled by the Individual Defendants—defaulted rather than attempt to defend their illegal business practices.  And while the Individual Defendants and Relief Defendant MostCap have nominally appeared, their participation in this litigation has been largely limited to conceding the allegations made by Plaintiffs. Most notably, in response to Plaintiffs' discovery requests, each Individual

-1-

Defendant ***admitted*** that he served as an officer, director, shareholder, manager, employee, and agent of each of the Corporate Defendants while simultaneously claiming to have no documents related to their business activities. Similarly, Relief Defendant MostCap ***admitted*** that it received funds from the Corporate Defendants while likewise maintaining that it has no documents reflecting why or for what purposes these funds were transferred. These admissions alone—and certainly in conjunction with the other evidence obtained by Plaintiffs from third parties—satisfy the requirements for individual liability and relief defendant liability.

Accordingly, Plaintiffs respectfully request that the Court enter summary judgment against the Defendants, order them to pay restitution and civil penalties, and permanently enjoin them from further violations of the law.

## I.   FACTUAL BACKGROUND & PROCEDURAL HISTORY

### A.   Defendants Operate a Mortgage Assistance Relief Services Scam

Defendants Michael Nabati, Armando Solis Barron, Dominic Ahiga, and Roger Dyer (collectively, "Individual Defendants") operated a mortgage assistance relief services scam through a web of corporate entities and fictitious business names. Statement of Uncontroverted Facts & Conclusions of Law ("SUF") 3-34. The corporate entities at the center of this scheme included Defendants Green Equitable Solutions, South West Consulting Enterprises, Inc. ("South West Consulting"), Apex Consulting & Associates Inc. ("Apex Consulting"), Infocom Entertainment Ltd, Inc. ("Infocom Entertainment"), Equity Relief Funding, Inc. ("Equity Relief Funding"), and Advent Consulting, Inc. ("Advent Consulting") (collectively, "Corporate Defendants"). SUF 3-19. The Corporate Defendants held themselves out to consumers using various fictious business names such as "Golden Home Services America," "Home Matters USA," "Academy Home Services," "Atlantic Pacific Service," and "Westwood Advocates." SUF 4, 7, 10, 13, 16.

Defendants marketed their "services" to consumers primarily through cold call telemarketing (including calls to phone numbers listed on the National Do Not Call Registry) and corporate websites.  SUF 36.  Defendants represented to consumers that, in exchange for several large, upfront payments, the consumer's mortgage interest rates and/or principal balances would be reduced.  SUF 37. Defendants also frequently represented that:

- The consumer's home could not be foreclosed on during the time that the consumer is paying for Defendants' "services" (SUF 38);
- The consumer need not make and should stop making their regular mortgage payments (SUF 39);
- The consumer should not communicate with their mortgage provider and should re-route all communications to Defendants (SUF 40);
- Defendants' "services" were part of, or associated with, a government program, such as those related to the COVID-19 pandemic (SUF 41); and
- The consumer can receive a refund of their payments at any time because Defendants' services are subject to a "money-back guarantee" (SUF 42).

None of these representations were true and several are expressly prohibited by law.

Defendants' promises enticed thousands of consumers into signing up, yet Defendants rarely, if ever, provided the agreed-upon services in return.  SUF 43. Instead, Defendants simply strung consumers along for as long as they would continue to make payments.  SUF 44.  When consumers complained about the lack of results and demanded refunds, Defendants simply ignored their requests and marked the consumer as "dead" in their internal records.  SUF 46.

Contrary to their promises, Defendants did not use consumer funds to procure mortgage relief or pay consumer mortgages.  SUF 47-49.  In reality, Defendants used consumer funds to enrich themselves.  As the Receiver has reported to the Court, over $2.6 million in consumer funds were used to buy

-3-

investment real estate properties in Orange County and San Diego.  *See* Dkt. 158 at 12.  Despite being purchased with corporate funds, these properties were purchased by individual trusts owned, controlled, and for the benefit of Nabati.  *Id.*  Similarly, in November 2021, approximately $125,000 in consumer funds was used to buy a high-end Mercedes Benz for Nabati.  SUF 47.  Defendants also converted consumer checks directly to cash which they then distributed amongst themselves.  SUF 48.  These cash handoffs occurred, not only at the offices of the Corporate Defendants, but also at Defendants' homes and in commercial shopping centers.  SUF 49.

Recognizing that these business activities could expose them to significant legal liability, Defendants used aliases when conducting the scam.  SUF 50.  For example, Nabati instructed consumers and employees to refer to him as "Paul Bronson" or "Alex Newman," while Solis Barron adopted the alias of "Solomon Devora."  SUF 25-26, 28.  Ahiga interacted with consumers using the name "Josh Weinstein," while Dyer used the aliases "Thomas Ward" or "Thomas Montgomery."  SUF 31, 33-34.  These aliases allowed the Defendants to hide their true identities from disgruntled consumers and hinder investigations by state regulators.  *See* Dkt. 9 at 6-8 (listing prior actions taken by state regulators).

**B.**     **Plaintiffs File Suit and The Court Issues a Temporary Restraining Order and Preliminary Injunction**

In September 2022, Plaintiffs filed the present suit alleging that Defendants' business activities violated (1) the Federal Trade Commission (FTC) Act by making deceptive representations related to mortgage relief services (15 U.S.C. § 45(a)), (2) the Mortgage Assistance Relief Services (MARS) Rule by collecting upfront fees for mortgage assistance relief services (12 C.F.R. § 1015.5), making prohibited representations related to mortgage assistance relief services (12 C.F.R. § 1015.3), making material misrepresentations related to mortgage assistance relief services (12 C.F.R. § 1015.3), and failing to make required disclosures (12 C.F.R.

§ 1014), (3) the Telemarketing Sales Rule (TSR) by calling consumers on the National Do Not Call Registry and failing to pay required fees (16 C.F.R. §§ 310.4, 310.8), (4) the COVID-19 Consumer Protection Act (CCPA) by falsely representing an affiliation with government programs related to the COVID-19 pandemic (Public Law 116-260, 134 Stat 1182 Title XIV, Section 1401(b)(2)), and (5) the California Consumer Financial Protection Law (CCFPL) by violating each of the above federal laws and regulations (Cal. Fin. Code § 90003(a)(1)).  Dkt. 1.

Plaintiffs also applied for an *ex parte* Temporary Restraining Order ("TRO").  Dkt. 9.  In support of their TRO Application, Plaintiffs submitted over a dozen sworn declarations from consumers who had been harmed by Defendants' illegal business practices.  *See* Dkts. 13-18.  After reviewing this evidence, the Court found that Plaintiffs were likely to succeed on the merits of their claim, entered the requested temporary restraining order, and issued a show cause order as to why a preliminary injunction should not be entered.  Dkt. 25.  After the Defendants failed to appear at the show cause hearing, the Court converted the TRO into a Preliminary Injunction.  Dkt. 40.

Following issuance of the Preliminary Injunction, Plaintiffs filed a First Amended Complaint that added Equity Relief Funding, Advent Consulting, Nabati, and Solis Barron as defendants, and MostCap as a relief defendant.  *See* Dkt. 41.  Plaintiffs subsequently served the First Amended Complaint on all defendants.  *See* Dkts. 52, 53, 72, 73, 82, 83.  Despite being owned and operated by the Individual Defendants, none of the Corporate Defendants responded to the First Amended Complaint or otherwise appeared to defend themselves in this action.  *See* Dkts. 98-103.  Accordingly, the Clerk entered default against each of the Corporate Defendants.  Dkt. 104.

## C.   The Individual Defendants Admit Their Authority Over the Corporate Defendants

After receiving their Answers, Plaintiffs served requests for production, interrogatories, and requests for admission on the Individual Defendants and Relief Defendant MostCap seeking basic information regarding their involvement in the scam and their purported defenses.  SUF 51.  Particularly relevant here, Plaintiffs asked each Individual Defendant to admit that he served as an officer, director, shareholder, manager, employee, and agent of each of the Corporate Defendants. SUF 52.

Dyer and Ahiga failed to respond to Plaintiffs' discovery requests and, thus, admitted that they had served as officers, directors, shareholders, managers, employees, and agents of each of the Corporate Defendants.  SUF 54-55; FED. R. CIV. P. 36 (a)(3).  Solis Barron, Nabati, and MostCap, despite being represented by counsel, all missed the deadline to respond to Plaintiffs' discovery by several weeks, and thus also admitted the matters set forth in Plaintiffs' Requests for Admission.  SUF 56-58; FED. R. CIV. P. 36(a)(3).  Each of these defendants also claims to have no documents related to the business operations of the Corporate Defendants.  SUF 60, 64, 67.

Thus, in light of Defendants' own admissions and the evidence amassed by Plaintiffs, the Court should enter summary judgment.

## II.    LEGAL STANDARD

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323.  A disputed fact is material if it might affect the outcome

-6-

1  of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.
2  242, 248 (1986).

3          In deciding a motion for summary judgment, all justifiable inferences may
4  be drawn in favor of the nonmovant. *Id.* at 255.  "The nonmoving party, however,
5  must not simply rely on the pleadings and must do more than make 'conclusory
6  allegations in an affidavit.'" *Ecology Recycling Services LLC v.*
7  *Engineering/remediation Resources Grp, Inc.*, 2022 WL 16963519, at *2 (C.D.
8  Cal. July 20, 2022) (Aenlle-Rocha, J.) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497
9  U.S. 871, 888 (1990)).  Moreover, "an inference as to a[] material fact may be
10 drawn in favor of the nonmoving party only if it is rational or reasonable and
11 otherwise permissible under the governing substantive law." *T.W. Elec. Service,*
12 *Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

13 **III.   ARGUMENT**

14       **A.      It is Undisputed That the Corporate Defendants Violated the FTC**
15       **Act, the MARS Rule, the TSR, the CCPA, and the CCFPL**

16              *1.      The Corporate Defendants Violated the FTC Act*

17 The FTC Act prohibits "unfair or deceptive acts or practices in or affecting
18 commerce." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).[1]  An act
19 or practice is deceptive if "first, there is a representation, omission, or practice that,
20 second, is likely to mislead consumers acting reasonably under the circumstances,
21 and third, the representation, omission, or practice is material." *FTC v. Gill,* 265
22 F.3d 944, 950 (9th Cir. 2001).  "[P]roof of individual reliance by each purchasing
23 customer is not needed" to prove a violation of the FTC Act.  *FTC v. Figgie*
24 *Intern., Inc.,* 994 F.2d 595, 605 (9th Cir. 1993).  Rather, "[e]xpress claims, or
25 deliberately made implied claims, used to induce a purchase are presumed to be
26 material" and "[c]onsumer reliance on express claims is presumed reasonable."

27
28 [1] All internal citations and quotations are omitted from case citations.

-7-

*FTC v. Universal Premium Servs., Inc.,* 2007 WL 9728965, at *2 (C.D. Cal. Feb. 21, 2007).

In their TRO Application, Plaintiffs submitted more than a dozen declarations from consumers demonstrating (1) that the Corporate Defendants made representations regarding mortgage assistance relief services, (2) that those representations were misleading in that the Corporate Defendants did not provide the promised mortgage assistance relief services, and (3) that the representations were material to consumers. Dkt. 9 at 11-14.[2]  After reviewing this evidence, the Court found that Plaintiffs had demonstrated a likelihood of success on the merits. Dkt. 25 at 4.

Since then, Plaintiffs have obtained additional evidence showing violations of the FTC Act by the Corporate Defendants.  Most notably, Plaintiffs obtained a sworn declaration from a former employee of the Corporate Defendants, Alessandra Cabral.  SUF 70.  As Ms. Cabral recounts in her declaration, "[f]requently, we would tell potential clients that we could get them interest rates as low as 2% or 3%, that up to 1/3rd off their principal balance would be forgiven, and that there would be no impact to their credit score."  SUF 79.  However, Ms. Cabral quickly "became concerned that the company was not providing the mortgage loan modification that it promised clients" and she personally observed "hundreds of client files that had received little or no attention from employees of the company, including clients who had been paying the company for over a full year and even for over two years."  SUF 82-83.  When Ms. Cabral attempted to address these issues, Nabati and Solis Barron instructed her to *stop* obtaining mortgage relief for customers as it would result in the Corporate Defendants receiving fewer monthly payments.  SUF 86.

_____

[2] For ease of reference, Plaintiffs are re-filing these consumer declarations as attachments hereto.

In addition to this declaration, Plaintiffs also recovered thousands of internal emails, text messages, and business records created by the Defendants that demonstrate their use of false and deceptive mortgage representations.  To highlight a few examples, when consumers complained that no action had been taken on their account or demanded a refund, they were marked as "dead" and placed on a "do not call" list.  SUF 91 (consumer paid Defendants over $10,000 in fees over approximately 9 months before being marked as "dead" and placed on "do not call" list after threatening legal action due to his home being placed in foreclosure).  These documents also confirm that Defendants preyed on vulnerable consumers by promising mortgage relief that they could never deliver.  SUF 92 (mentally disabled consumer "cancelled" by the Defendants after paying over thousands in fees when legal guardian asked the company how it was complying with the law).

In short, Plaintiffs have met their burden to show that the Corporate Defendants violated the FTC Act.

### 2.    *The Corporate Defendants Violated the MARS Rule*

There is also no genuine dispute of material fact that the Corporate Defendants violated the MARS Rule.  The MARS Rule prohibits mortgage assistance relief services providers from "request[ing] or receiv[ing] payment of any fee or other consideration" prior to a consumer obtaining mortgage relief. 12 C.F.R. § 1015.5; *see FTC v. Kutzner*, 2017 WL 4685286, at *8 (C.D. Cal. Sept. 5, 2017).  The MARS Rule also prohibits mortgage assistance relief service providers from misrepresenting various aspects of the promised mortgage assistance.  12 C.F.R. § 1015.3(b)(1)-(4).  Finally, the MARS Rule requires providers to make certain disclosures to clients prior to providing mortgage assistance relief services.  12 C.F.R. § 1015.4(b)(1)-(3), (c).

As Plaintiffs demonstrated in their TRO Application, numerous consumers declare that the Corporate Defendants extracted thousands of dollars from them in

advance of (and generally without ever) providing any mortgage assistance relief services in return. Dkt. 9 at 14-17. Plaintiffs also demonstrated (1) that the Corporate Defendants illegally instructed consumers not to contact their lenders or servicers, (2) misrepresented multiple aspects of the promised mortgage assistance relief services, and (3) failed to make the required mandatory disclosures. *Id.*

Since filing their TRO Application, Plaintiffs issued subpoenas to various check cashing facilities that the Defendants used to convert consumer checks to cash. SUF 93-95. Records produced in response to these subpoenas has revealed that, in addition to the funds they received via electronic bank transfers, Defendants also converted more than ***eight million dollars*** in consumer checks and money orders directly into cash, which they then distributed amongst themselves. SUF 96. These checks show references to the promised mortgage relief services that were never provided and, indeed, there is no evidence that these funds were ever used for business activities at all, let alone to obtain the promised mortgage assistance relief services. SUF 97. And, as mentioned above, Ms. Cabral declares that the Corporate Defendants regularly misrepresented aspects of the mortgage assistance relief services they claimed to provide. SUF 84. Thus, Plaintiffs have met their burden to show that the Corporate Defendants violated the MARS Rule.

### 3. The Corporate Defendants Violated the TSR

There is also no genuine dispute of material fact that the Corporate Defendants violated the TSR. The TSR requires telemarketers to pay a fee to access the National Do Not Call Registry and prohibits telemarketers from contacting consumers who have registered their telephone number on the National Do Not Call Registry. 16 C.F.R. § 310.8; 16 C.F.R. § 310.4(b)(1)(iii)(B). As Plaintiffs demonstrated in their TRO Application, there is no indication that any of the Corporate Defendants paid the requisite fee to access the Registry and multiple consumers declare that they were contacted by the Corporate Defendants despite being listed on the Registry. Dkt. 9 at 18; SUF 98. In addition to this evidence,

Ms. Cabral also states in her declaration that she "is not aware of anyone at the company checking to see if a client was on the Do Not Call list prior to calling them." SUF 81. Thus, Plaintiffs have met their burden to show that the Corporate Defendants violated the TSR.

        *4.      The Corporate Defendants Violated the CCPA*

There is also no genuine dispute of material fact that the Corporate Defendants violated the CCPA. The CCPA prohibits any "deceptive act or practice . . . that is associated with . . . a government benefit related to COVID-19." Public Law 116-260, 134 Stat 1182, Title XIV, Section 1401(b)(2). As Plaintiffs demonstrated in their TRO Application, the Corporate Defendants regularly told consumers that their services were provided as part of a government benefit related to the COVID-19 pandemic. Dkt. 9 at 17. Since filing their TRO Application, Plaintiffs also recovered a pre-recorded message used by the Corporate Defendants in telemarketing that expressly makes these false COVID-19 claims. SUF 100 (audio recording touting Home Matters USA's ability to provide lower interest rates "thanks to the government-backed hardship programs funded by the COVID-19 quarantine bailout funds"). Ms. Cabral similarly declares that "[w]e would also frequently tell potential clients that we were able to provide [mortgage relief] services as part of a government-backed hardship program related to the COVID-19 pandemic." SUF 80. Thus, Plaintiffs have met their burden to show that the Corporate Defendants violated the CCPA.

        *5.      The Corporate Defendants Violated the CCFPL*

Finally, there is no genuine dispute of material fact that the Corporate Defendants violated the CCFPL. The CCFPL prohibits certain "covered persons" from engaging "in any unlawful, unfair, deceptive, or abusive act or practice with respect to consumer financial products or services." Cal. Fin. Code § 90003(a)(1). Included in the law's definition of "financial product or service" is "providing services to assist a consumer with . . . modifying the terms of any extension of

-11-

credit[] or avoiding foreclosure." Cal. Fin. Code § 90005(k)(8)(B). As described above, Defendants have engaged in unlawful and deceptive conduct relating to consumer financial products or services, to wit, providing services to assist consumers with modifying extensions of credit or avoiding foreclosure, by violating the FTC Act, the MARS Rule, the CCPA, and the TSR. *See* Section III.A.1-4. Thus, to the extent that Plaintiffs have met their burden to show a violation of any of the above federal laws or regulations, Plaintiffs have also met their burden with respect to the CCFPL.

> 6. *Neither the Corporate Defendants nor the Individual Defendants Dispute These Violations of Law*

Recognizing the overwhelming weight of evidence, neither the Corporate Defendants nor the Individual Defendants have challenged Plaintiffs' allegations. The Corporate Defendants failed to appear or respond to the Court's Order to Show Cause and, after they failed to respond to the First Amended Complaint, default was entered against each of them. Dkt. 104. Thus, absent vacatur, they have no further right to dispute their violations of law. *VLM Food Trading Intern., Inc. v. Illinois Trading Co.,* 811 F.3d 247, 255 (7th Cir. 2016) ("The defaulting party cannot contest the fact of his liability unless the entry of default is vacated under Rule 55(c)."); *DirecTV, Inc. v. Huynh,* 503 F.3d 847, 851 (9th Cir. 2007).

The Individual Defendants have also failed to come forward with any rebuttal as to the violations of law by the Corporate Defendants. Plaintiffs served interrogatories on each of the Individual Defendants asking them to state the complete factual and legal basis, if any, as to why they should not be held liable for the allegations set forth in each count of the Complaint. SUF 51, 61, 69. Dyer and Ahiga did not respond to these interrogatories. SUF 54-55. Nabati's response states only that he personally "was not involved in cold-calling and all leads were legitimate." SUF 61. Similarly, Solis Barron responds only that he personally "did not engage in any unlawful mortgage loan modification schemes, and was not

-12-

in shape or form an officer, director, controller in any of the Corporate Defendants' businesses, and did not engage in any sales activities for any loan modification programs, and did not engage or involve himself in any sign up of clients."[3]  SUF 69.  Nabati, MostCap, and Solis Barron also claim to have no documents at all regarding the business activities of the Corporate Defendants.  SUF 60, 64, 67.  In short, to the extent the Defendants have responded to Plaintiffs' discovery requests at all, they have failed to contest Plaintiffs' allegations as to the violations of law by the Corporate Defendants.

**B.    It is Undisputed That the Corporate Defendants Acted as a Common Enterprise**

Plaintiffs' allegations that the Corporate Defendants acted as a common enterprise also stand undisputed.  "Where one or more corporate entities operate in common enterprise, each may be held liable for the deceptive acts and practices of the others."  *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012).  In making this determination, the Court looks to four factors: "(1) common control; (2) sharing office space and offices; (3) whether business is transacted through a 'maze of interrelated companies'; and (4) commingling of funds."  *Id.*

Each of these factors remains satisfied.  First, each of the Individual Defendants admitted that they were officers, directors, and managers of each of the Corporate Defendants.  SUF 54-56, 58, 62; *see also* SUF 74-78 (former employee similarly identifying the four Individual Defendants as managers of the business).  Second, the Corporate Defendants, along with Relief Defendant MostCap, all used the same office space to conduct their operations and there is no indication that any office space was unique to any Corporate Defendant.  SUF 21, 73, 105.  Third,

---

[3] As discussed below in Section III.C, these naked denials of involvement are insufficient to defeat summary judgment.

-13-

each of the Corporate Defendants used essentially the same trade names to conduct business and employees regularly performed work for each of these trade names without regard as to which Corporate Defendant the consumer had contracted with. SUF 4, 7, 10, 13, 16, 72.  Fourth, consumer funds intended for one Corporate Defendant were deposited into accounts belonging to another and the Individual Defendants enriched themselves from each of the various accounts indiscriminately.  SUF 45, 48, 49.

### C.   There is No Genuine Dispute of Material Fact as to the Liability of the Individual Defendants

Defendants cannot raise any genuine dispute of material fact as to their own individual liability.  Individual liability exists where "(1) the corporation committed misrepresentations of a kind usually relied on by a reasonably prudent person and resulted in consumer injury, and (2) individuals participated directly in the violations or had authority to control the entities." *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1101 (9th Cir. 2014).  While it is true that, in order to show individual liability for an FTC Act violation, Plaintiffs must also show that each individual had "knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct," Plaintiffs "need not show that a defendant intended to defraud consumers" and "the extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability." *Id.* at 1101-02.

As demonstrated above, there is no genuine dispute of material fact that the Corporate Defendants "committed misrepresentations of a kind usually relied on by a reasonably prudent person." *See* Section III.A.  It is also undisputed that these representations "resulted in consumer injury" because consumers who relied upon Defendants' misrepresentations suffered approximately $15.8 million in harm simply by paying for services they did not receive. *See* Section III.E.  And, for the

-14-

reasons set forth below, there is no genuine dispute of material fact as to the liability of each of the Individual Defendants.

Additionally, under the CCFPL, persons may be individually liable for providing "substantial assistance" to an entity that violates the law.  A defendant provides substantial assistance to an unlawful venture where the person "in some sort associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed."  *CFPB v. D & D Mktg.*, 2016 WL 8849698, at \*12 (C.D. Cal. Nov. 17, 2016) (cleaned up).  The threshold for providing substantial assistance "is low," and can be shown by providing more than mere "casual or incidental" help to a telemarketing business, and includes simple "back-end handling of consumer files."  *FTC v. Lake*, 181 F. Supp. 3d 692, 699 (C.D. Cal. Feb. 24, 2016).  As explained below, the Individual Defendants associated themselves with the unlawful ventures and were more than incidentally involved in the businesses.

> 1.     *Nabati Participated Directly in the Violations & Had Authority to Control the Corporate Defendants*

Nabati participated directly in the violations of law by the Corporate Defendants.  Nabati worked in the company offices on a daily basis, personally reviewed consumer files, and approved the mortgage assistance relief promises that were made to consumers.  SUF 109 (Nabati "was closing the deals . . . figuring out what could be done and what couldn't be done as far as executing a loan restructure or financial assistance."); SUF 110 ("salesperson in coordination with Nabati" would determine what loan modification to propose to a consumer); SUF 111 (Nabati would "get on the phone" with clients and "close deals"); SUF 129 (Nabati requesting that Ahiga "please bring me the [G]loudemans file"); SUF 130.

Nabati also personally trained employees in how to communicate with consumers and sent and received paperwork from consumers himself.  SUF 101 ("I will do a training with you all today"); SUF 75 ("Michael Nabati was responsible

-15-

for hiring, training, and supervising the company's employees generally").  When consumers expressed dissatisfaction with the services provided by the Corporate Defendants, Nabati would speak with the consumer directly.  SUF 112.  In short, from the day that a consumer was approached by the Corporate Defendants until the day that the consumer stopped doing business with the Corporate Defendants, Nabati was directly involved in the violations of the law by the Corporate Defendants.

Nabati also had authority to control the actions of the Corporate Defendants. Nabati admitted, in response to Plaintiffs' requests for admission, that he was an officer, director, shareholder, and manager of each of the Corporate Defendants. SUF 56, 62.  This alone establishes individual liability.  *John Beck*, 865 F. Supp. 2d at 1080 ("Status as a corporate officer is sufficient to establish individual liability."); *see also FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997).  Deposition testimony also confirms these admissions.  SUF 122 ("nothing [was] done without the direction of Michael Nabati" and the Corporate Defendants were "his company"); SUF 113 (Nabati "managed the day-to-day activities," "completely" ran the businesses' operations, and was considered "the boss" by employees).  Nabati also signed the lease for the companies' offices in Koreatown.  SUF 105.  Similarly, Nabati's role in the business was more than casual or incidental, and he took steps to make the business succeed such that he provided substantial assistance to the scheme.

Finally, Nabati's claim in his interrogatory responses that he "was not involved in cold-calling and all leads were legitimate" is irrelevant.  Whether or not Nabati "cold-called" consumers or used "legitimate" leads has no bearing on whether he personally participated in the violations of the FTC Act, MARS rule, TSR, CCPA, and CCFPL.   Likewise, Nabati's attempt to shift blame to his co-defendants fails as he has produced ***no*** evidence to support this claim and, under binding Ninth Circuit law, he cannot defeat summary judgment by simply putting

forth a naked disavowal of responsibility. *Publishing Clearing House,* 104 F.3d at 1171 ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."); *CFPB v. Gordon*, 819 F.3d 1179, 1194 (9th Cir. 2016) ("This conclusory, self-serving affidavit is insufficient to raise a triable issue of fact as to whether Gordon had authority to control advertising because it lacks detailed facts and supporting evidence").

2.      *Solis Barron Participated Directly in the Violations & Had Authority to Control the Corporate Defendants*

Solis Barron also participated directly in the violations of law by the Corporate Defendants.  Dyer testified in his deposition that Solis Barron was responsible for "closing sales deals" and spoke directly with consumers regarding requests to refinance their home mortgages.  SUF 114.  Similarly, according to records produced by FedEx, Solis Barron, using his alias "Solomon Devora," received packages from consumers that contained their documents and payments for services.  SUF 106.  Former employee Alessandra Cabral declares that "Armando Solis Barron was responsible for determining what kinds of offers the Sales representatives could present to the client.  For example, Armando Solis Barron would tell the Sales representatives what interest rates they could offer to a particular client.  He would also instruct employees on the Submissions team as to whether or not offers made by mortgage companies and/or servicers were good enough to relay to consumers."  SUF 76; *see also* SUF 127 (Solis Barron provided "loan mods" to consumers as part of the business).  These sworn statements are corroborated by the Defendants' internal communications, such as a Telegram message in which an employee states that she is going to give a consumer file to Solis Barron so that he can "create [a] proposal" for that consumer.  SUF 102.

Additionally, Solis Barron should also be found liable due to his authority to control the Corporate Defendants.  By failing to timely respond to Plaintiffs'

-17-

Requests for Admission, Solis Barron admitted that he was an officer, director, shareholder, manager, employee, and agent of each of the Corporate Defendants. SUF 58.[4]  This alone establishes individual liability.  *John Beck*, 865 F. Supp. 2d at 1080; *Publishing Clearing House*, 104 F.3d at 1170.  Further confirming this, Dyer and Ahiga also identified Solis Barron as being responsible for the decision to dissolve certain Corporate Defendants and setting employee compensation.  SUF 115 ("Q. So Michael Nabati and Armando Solis Barron were the individuals responsible for the decision to dissolve South West Consulting. Yes? A. Correct."); SUF 123 (Solis Barron was the individual responsible for determining Ahiga's compensation).  Former employees of the Corporate Defendants have also identified Solis Barron and Nabati as "the bosses," co-CEOs, and managers of the Corporate Defendants.  SUF 127.  Finally, Nabati instructed employees to treat Ahiga as "second in command" to only himself and Solis Barron.  SUF 103.  Solis Barron was thus more than casually or incidentally involved such that he provided substantial assistance to the success of the Corporate Defendants.

Solis Barron may claim, as he did in his discovery responses, that he "did not engage in any unlawful mortgage loan modification schemes, and was not in shape or form an officer, director, controller in any of the Corporate Defendants' businesses, and did not engage in any sales activities for any loan modification programs, and did not engage or involve himself in any sign up of clients."  SUF 69.  But this argument fails for two reasons.  First, as discussed above, Solis Barron **admitted** that he was an officer, director, shareholder, manager, agent, and

---

[4] Over two months after the deadline for responding to Plaintiffs' Requests for Admission, Solis Barron served "responses" to Plaintiffs' requests that purported to deny the requested admissions.  SUF 66.  But, as Plaintiffs advised Solis Barron's counsel at the time, these admissions can only be withdrawn if "the court, on motion, permits the admission to be withdrawn or amended."  FED. R. CIV. P. 36(a)(3); FED. R. CIV. P. 36(b).  As Solis Barron has not filed any motion to withdraw the admissions, they remain "conclusively established." *Id.*

-18-

employee of each of the Corporate Defendants by failing to deny Plaintiffs' requests for admission in the time period required by Rule 36.  SUF 58.  Second, even if Solis Barron had not admitted these facts, his naked disavowal of liability is insufficient under Ninth Circuit law to avoid summary judgment.  *Publishing Clearing House,* 104 F.3d at 1171; *Gordon*, 819 F.3d at 1194.

          3.     *Ahiga Participated Directly in the Violations & Had Authority to Control the Corporate Defendants*

Ahiga also participated directly in the violations of law.  At his deposition, Ahiga testified that he typically worked in the company offices "three to four" days per week and that he would start as early as 6AM and sometimes work until as late as 7PM.  SUF 124.  Ahiga testified that he was responsible for processing consumer loan modification applications and frequently spoke with loan servicers regarding potential mortgage assistance.  SUF 125; *see also* SUF 116 ("[Ahiga] was in charge of contacting clients, lenders, so forth" and responsible for "the processing office").  This is further confirmed by messages in which Nabati gave Ahiga instructions on how to process individual consumer files.  SUF 86.

In addition to his work processing applications, Ms. Cabral also declares that "Ahiga was responsible for handling clients who were unhappy with the services the company provided them and for managing the employees in the Compliance department."  SUF 77.  This is also confirmed by the documentary evidence.  For example, Ahiga sent a message to Dyer, complaining that he had to change his phone number because a disgruntled consumer listed his prior phone number on scampulse.com, a website used to report scams.  SUF 132.  Similarly, in a message to Nabati, Ahiga states that he is "on the phone with an [sic] upswell"[5] and then, later, "on the phone with another client."  SUF 131.  Ahiga's involvement was

---

[5] Defendants would refer to certain consumers as "upsells" when they believed that the consumer might be willing to pay an additional fee on top of the monthly payments they were already making.  SUF 85.

more than casual or incidental such that he provided substantial assistance to the success of the Corporate Defendants' scheme.

Furthermore, Ahiga also had authority to control the Corporate Defendants. As with the other Defendants, by failing to respond to Plaintiffs' Requests for Admission, Ahiga admitted that he was an officer, director, shareholder, employee, and agent of each of the Corporate Defendants. SUF 55. Again, this is enough by itself to conclude that he is individually liable. *John Beck*, 865 F. Supp. 2d at 1080; *Publishing Clearing House*, 104 F.3d at 1170. But even setting that aside, it is clear from the documentary evidence that Ahiga controlled significant aspects of the Corporate Defendants. For example, Ahiga identified himself on corporate paperwork as the CEO, CFO, Secretary, Director, and Agent of both Defendant Apex Consulting and Defendant Green Equitable Solutions. SUF 3, 9 (incorporation paperwork for both entities). Ahiga was also involved in the process of dissolving these entities. SUF 9 (dissolution paperwork signed by Ahiga for Apex Consulting); SUF 133 ("I have to call [G]ypsy this morning to dissolve [Green Equitable Solutions]").

### 4.   *Dyer Participated Directly in the Violations & Had Authority to Control the Corporate Defendants*

Finally, Dyer also participated directly in the violations of law by the Corporate Defendants. As Dyer himself testified at his deposition, he worked on the "sales" team and served as an "opener" for contacting consumers who might be interested in the Corporate Defendants' illegal mortgage assistance relief services. SUF 117. Dyer also admitted to contacting mortgage loan servicers on behalf of consumers as well. SUF 118. Dyer also testified that he "was responsible for handling the money" taken in by the Corporate Defendants and that he would open bank accounts for the Corporate Defendants to use to receive consumer funds. SUF 120. Dyer also acknowledged that he "understand[s] now, in retrospect, that it's illegal to charge fees up front." SUF 119. All of this testimony comports with

Ms. Cabral's declaration.  SUF 78 ("Roger Dyer was responsible for opening and maintain the company's bank accounts and mailboxes, depositing or cashing checks, making bank withdrawals, and purchasing supplies for the company."). Moreover, Dyer's involvement with and participation in the Corporate Defendants was more than casual or incidental such that he provided substantial assistance to the success of the Corporate Defendants.

Additionally, Dyer also possessed authority to control the Corporate Defendants.  As with the other Defendants, by failing to respond to Plaintiffs' Requests for Admission, Dyer admitted that he was an officer, director, shareholder, manager, employee, and agent of each of the Corporate Defendants. SUF 54.  Here as well, this fact alone is sufficient to hold him individually liable. *John Beck*, 865 F. Supp. 2d at 1080; *Publishing Clearing House*, 104 F.3d at 1170. These admissions are also reflected in corporate filings to the California Secretary of State where Dyer is identified as the CEO, CFO, Secretary, Director, and Agent for each of Infocom Entertainment, South West Consulting, and Equity Relief Funding.  SUF 6, 12, 15.

> **D.**    **There is No Genuine Dispute of Material Fact That MostCap Received Assets from the Common Enterprise Without a Legitimate Claim to Those Assets**

There is also no genuine dispute of material fact that MostCap received assets from the common enterprise without a legitimate claim to those assets.  To obtain disgorgement against a relief defendant, a plaintiff must show that the nominal defendant "(1) received ill-gotten funds and (2) do[es] not have a legitimate claim to those funds."  *SEC v. World Capital Markets, Inc.*, 864 F.3d 996, 1004 (9th Cir. 2017).  As to the first factor, MostCap has admitted, in response to requests for admission, that it received funds from each of the Corporate Defendants.  SUF 57, 65.  As to the second factor, Plaintiffs served interrogatories on MostCap asking it to identify assets that were transferred to it

and state the reasons for those transfers.  SUF 64.  MostCap did not provide any explanation in its interrogatory responses and has produced no documents that would explain why it legitimately received these funds.  *Id.* Thus, the Court should enter summary judgment here as well.

> **E.      The Court Should Enter Plaintiffs' Proposed Permanent Injunction & Order the Defendants to Pay Restitution and Civil Penalties**

Finally, the Court should enter judgment in the form of Plaintiffs' Proposed Permanent Injunction & Order to Pay Restitution and Civil Penalties ("Proposed Judgment").  Plaintiffs' Proposed Judgment orders the Defendants to pay approximately $15.8 million in restitution.  Plaintiffs are entitled to seek restitution under the MARS Rule, the TSR, the CCPA, and the CCFPL.  *See* 15 U.S.C. § 57b(b); Cal. Fin. Code § 90012(b).  After analyzing financial records received from banks and check cashing facilities used by the Defendants, Plaintiffs have conservatively calculated approximately $15.8 million in consumer injury that should be redressed.  SUF 107.

In addition to restitution, Plaintiff DFPI also seeks an award of civil penalties in the amount of $3,095,000.  The DFPI is authorized to seek civil penalties under the CCFPL.  Cal. Fin. Code § 90012(c).  The DFPI's civil penalty calculation consists of a $5,000 per day penalty from the day that DFPI acquired civil penalty authority (January 1, 2021) to the filing of Plaintiffs' Complaint (September 12, 2022).  This penalty amount has been calculated using the most conservative tier of DFPI's penalty authority and covers only a portion of the time period in which the Defendants engaged in their violations of law.[6]

---

[6] To the extent the Defendants liabilities exceed their assets, the DFPI agrees to prioritize consumer restitution ahead of collecting on its civil penalties.

-22-

Finally, Plaintiffs' Proposed Judgment includes a permanent injunction intended to prevent the Defendants from further violations of the law.  Plaintiffs' Proposed Judgment bars the Defendants from making misrepresentations regarding any goods or services they sell in the future.  *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 394 (1965).  Given Defendants' track record of evading past law enforcement efforts, the Proposed Judgment also relatedly bans the Defendants from engaging in telemarketing and debt relief work going forward.  *FTC v. Gill*, 265 F.3d 944, 957 (9th Cir. 2001) (affirming ban on providing credit repair services); *FTC v. ABC Hispana, Inc.*, 2017 WL 3769195, at *2 (C.D. Cal. Aug. 28, 2017) (ban on telemarketing).

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter summary judgment.

Dated:  June 9, 2023                    Respectfully submitted,

*/s/ Miles D. Freeman*
MILES D. FREEMAN
mfreeman@ftc.gov
KARINA A. LAYUGAN
klayugan@ftc.gov
CARLA L. CHEUNG
ccheung1@ftc.gov
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Tel: (310) 824-4300
Fax: (310) 824-4380

*Attorneys for Plaintiff Federal Trade Commission*

*/s/ Taylor Steinbacher*
TAYLOR STEINBACHER
Taylor.Steinbacher@dfpi.ca.gov
LOUIS LAVERONE
Louis.Laverone@dfpi.ca.gov
California Department of Financial Protection & Innovation
320 West 4th Street, Suite 750
Los Angeles, CA 90013
Tel: (213) 576-7500
Fax: (213) 576-7181

*Attorneys for Plaintiff California Department of Financial Protection & Innovation*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 11-6.2, the undersigned, counsel of record for

Plaintiff Federal Trade Commission, certifies that this brief contains 6,991 words,

which complies with the word limit of Local Rule 11-6.1.

Dated:  June 9, 2023                          Respectfully submitted,

                                              */s/ Miles D. Freeman*
                                              MILES D. FREEMAN
                                              mfreeman@ftc.gov
                                              Federal Trade Commission
                                              10990 Wilshire Boulevard, Suite 400
                                              Los Angeles, CA 90024
                                              Tel: (310) 824-4300
                                              Fax: (310) 824-4380

                                              *Attorney for Plaintiff Federal Trade
                                              Commission*

## FILER'S ATTESTATION OF CONCURRENCE

Pursuant to Local Rule 5-4.3.4(a)(2), I, Miles D. Freeman, attest that all

other signatories concur in the content of the foregoing document and authorize its

filing.

Dated:  June 9, 2023                          Respectfully submitted,

                                              */s/ Miles D. Freeman*
                                              MILES D. FREEMAN
                                              mfreeman@ftc.gov
                                              Federal Trade Commission
                                              10990 Wilshire Boulevard, Suite 400
                                              Los Angeles, CA 90024
                                              Tel: (310) 824-4300
                                              Fax: (310) 824-4380

                                              *Attorney for Plaintiff Federal Trade
                                              Commission*