DAVID R. ZARO (BAR NO. 124334)
JOSHUA A. DEL CASTILLO (BAR NO. 239015)
MATTHEW D. PHAM (BAR NO. 287704)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
865 South Figueroa Street, Suite 2800
Los Angeles, California 90017-2543
Phone: (213) 622-5555
Fax: (213) 620-8816
E-Mail: dzaro@allenmatkins.com
        jdelcastillo@allenmatkins.com
        mpham@allenmatkins.com

Attorneys for Receiver
DAVID P. STAPLETON

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| FEDERAL TRADE COMMISSION, et al., | Case No. 2:22-cv-06499-FLA-MAR |
|---|---|
| Plaintiffs, | **THIRD INTERIM REPORT AND PETITION FOR INSTRUCTIONS OF RECEIVER, DAVID P. STAPLETON** |
| vs. | Judge Hon. Fernando L. Aenlle-Rocha |
| GREEN EQUITABLE SOLUTIONS, et al., | |
| Defendants. | |

**TO THIS HONORABLE COURT AND ALL INTERESTED PARTIES:**

**PLEASE TAKE NOTICE THAT** David P. Stapleton (the "Receiver"), the Court-appointed receiver for Defendants Green Equitable Solutions, also dba Academy Home Services; South West Consulting Enterprises, Inc. also dba Academy Home Service, Atlantic Pacific Service Group, Golden Home Services of America Enterprises, and Home Matters USA; Apex Consulting & Associate & Associates Inc. also dba Golden Home Services America and Home Matters USA Consulting; Infocom Entertainment Lit., Inc., also dba Amstar Service Group, Atlantic Pacific Service, and Home Relief Service of America; and their respective subsidiaries and affiliates (collectively, the "Receivership Entities" or "Entities")

hereby submits this Third Interim Report and Petition for Instructions (the "Report")[1] in accordance with Local Rule 66-6 and this Court's July 6, 2023 Order Granting Petition For Instructions of Receiver David P. Stapleton [ECF No. 212]. While this Report touches on the efforts undertaken by the Receiver since the commencement of his appointment, its focus is the critical tasks undertaken, and Assets recovered, by the Receiver and his professionals since the submission of the Receiver's March 22, 2023 Second Interim Report and Petition for Instructions (the "Second Interim Report") [ECF No. 158].

## I.  PRELIMINARY STATEMENT.

As reflected in this Court's September 14, 2022 Order Granting Plaintiffs' Ex Parte Application For Temporary Restraining Order With Asset Freeze, Appointment Of Temporary Receiver, Limited Expedited Discovery, And Order To Show Cause Why Preliminary Injunction Should Not Issue (the "Appointment Order") [ECF No. 25], as reaffirmed by the Court's September 29, 2022 Order Granting Plaintiffs' Request For Preliminary Injunction With Asset Freeze And Extending Authorization Of Temporary Receiver Through The Pendency Of The Action (the "Preliminary Injunction") [ECF No. 40], the Receiver has been charged with, among other things, assuming control over the Receivership Entities and their assets ("Receivership Assets" or "Assets"); recovering all available books and records relating to or concerning the Entities' business and financial activities; performing an analysis of those business and financial activities; and marshaling available Receivership Assets for the benefit of the receivership estate (the "Estate") and its potential creditors.

As the Receiver previously reported, based on his investigation and analysis, the Receiver has concluded that: [a] the Receivership Entities' business operations

---

[1] This Report is preliminary and based upon the information presently available to the Receiver. Any conclusions presented herein are subject to change as additional information is obtained.

were consistent with a fraudulent enterprise; [b] the Entities are not viable as a going concern; [c] millions of dollars obtained from consumers were fraudulently transferred to or for the benefit of the Entities' principals or suspected principals, affiliated entities under their control, or other affiliated persons; and [d] such fraudulently transferred funds were used to purchase various assets, including, at a minimum, real properties, against which the Estate has a claim.  As detailed below, the Receiver's document review and analysis and Asset recovery efforts continue, and, as the newly obtained information is incorporated into his analysis, the Receiver continues to refine or confirm his conclusions, including as to the availability of remaining recoverable Assets.

As addressed herein, the Receiver's efforts to date have resulting in his recovery of more than $2.4 million for the benefit of the Estate and its creditors, critically including victims of the consumer fraud alleged here.  Recently, the Receiver secured Court authority to market and sell two (2) additional real properties, which sales are anticipated to result in aggregate recoveries of an additional $1 million, approximately.  In addition, recently obtained information, which remains under review at the time of this Report's filing, suggests preliminarily that the Receiver may have viable fraudulent transfer or similar disgorgement claims against numerous parties and non-parties who appear to have been the recipients of at least hundreds of thousands of dollars in fraudulently transferred assets. Accordingly, and as detailed further herein, the Receiver recommends that this Court authorize him to continue the performance of his duties as established under the Appointment Order and Preliminary Injunction, and to submit a Fourth Interim Report and Petition for Instructions no later than 120 days following the submission of this Report.  While much progress has been made, it appears some significant work may remain – notably with respect to the completion of pending real property sales for the benefit of the Estate, the potential pursuit of additional fraudulent transfer claims, and the administration of an eventual  claims process and

distribution to consumer victims, or development and turnover of a restitution fund to the plaintiff regulators.

## II.   GENERAL BACKGROUND.

The Court and all interested parties are invited to review the following materials for a more detailed summary of the relevant facts underlying the above-entitled action and the instant receivership:

- Complaint for Permanent Injunction, Monetary Relief, and Other Relief (filed on September 12, 2022, ECF No. 1);
- Appointment Order (entered on September 14, 2022, ECF No. 25);
- Initial Report and Recommendations of Receiver, David P. Stapleton (filed on September 26, 2022, ECF No. 36);
- Preliminary Injunction (entered on September 29, 2022, ECF No. 40);
- First Amended Complaint for Permanent Injunction, Monetary Relief, and Other Relief (filed on October 28, 2022, ECF No. 43);
- Notice of Designation of Non-Party, The Michael R. Nabati Irrevocable Living Trust dated December 23, 2020, as a Receivership Entity (filed on November 4, 2022, ECF No. 50);
- First Interim Report (filed on November 18, 2022, ECF No. 60);
- Receiver's Notice of Completion of Sale of Real Property Located at 21202 Spurney Lane, Huntington Beach, CA 92646 (filed on January 31, 2023, ECF No. 132);
- Second Interim Report (filed on March 22, 2023, ECF No. 158);
- Order Approving Stipulation for Order: (1) Authorizing Receiver to Market and Sell Residential Real Properties; and (2) Releasing Defendant's Claim to Proceeds Recovered or Held by Receiver [Dkt. 195] (entered on June 21, 2023, ECF No. 196); and
- Order Granting Plaintiffs' Request for Preliminary Injunction With Asset Freeze and Extending Authorization of Temporary Receiver

Through the Pendency of the Action [Dkt. 188] (entered on July 5, 2023, ECF No. 210).

As reflected in the above-identified pleadings and orders, the plaintiffs Federal Trade Commission (the "FTC") and California Department of Financial Protection and Innovation (collectively with the FTC, the "Regulators") alleged that the Receivership Entities and their principals engaged in a mortgage modification scheme whereby distressed mortgage borrowers were fraudulently induced to make payments to the Receivership Entities in exchange for loan modification services which were rarely, if ever, provided, and the proceeds from which were diverted by the Receivership Entities and their principals for their unilateral benefit. On the basis of their allegations, and on motion to the Court, the Regulators secured the appointment of the Receiver, who has diligently pursued his objectives as set forth in the Appointment Order, including with respect to an investigation and analysis of the business and financial activities of the Receivership Entities, whether such activities were legitimate or fraudulent, and, if fraudulent, the Entities' misappropriation of fraudulently obtained funds paid by their victims. The Receiver has recovered, for the benefit of the Estate, cash in excess of $2.4 million[2], along with two residential real properties with an estimated aggregate net sale value of $1 million. Furthermore, in the course of completing his analysis of the business and financial affairs of the Entities, the Receiver identified additional persons of interest who were subsequently added by the Regulators as defendants. Finally, the Receiver has preliminarily identified what appear to be fraudulent transfers of hundreds of thousands of dollars in Entity funds to third parties, including at least one current individual defendant, and persons affiliated with another. As of the date of submission of this Report, the Receiver is in the process of attempting to confirm the dates and amounts of the transfers, and making a determination as to whether

---

[2] As discussed below, this amount included proceeds from Court-approved sales of real properties.

commencing efforts to recover such transfers would yield a cost-effective benefit for the Estate.

## III. SUMMARY OF RECEIVER'S ACTIVITIES AND EFFORTS.

Since the Receiver's appointment, he has undertaken a number of efforts aimed at, among other things, understanding the Entities and their interrelationships, their business and financial activities and operations, and – critically – the amounts and uses of funds raised by the Entities from consumers in the pre-receivership period, along with the amount of Assets available for recovery. The following reflects a summary of the Receiver's activities and efforts through the present, most importantly including those since the Receiver's Second Interim Report was submitted on March 22, 2023 (the "Reporting Period"):

### A. Investigation And Analysis Regarding The Operations Of The Receivership Entities.

Building upon the work undertaken during prior reporting periods, the Receiver continued his investigation and analysis into the pre-receivership operations of the Receivership Entities. As discussed in greater detail in the Receiver's Second Interim Report, the Receivership Entities' pre-receivership operations were consistent with a fraudulent enterprise, and his investigative efforts during the Reporting Period largely related to further confirming this conclusion, refining his understanding of the fraud, and, as discussed in Section III.B, below, supplementing his accounting by incorporating a variety of newly obtained records into his analysis, including with respect to the amount and location of additional recoverable Assets.

Among the most noteworthy developments in the Receiver's investigative efforts during the Reporting Period, the Receiver identified and obtained access to downtown Los Angeles office space leased by the Receivership Entities for use in carrying out their operations. In a visit to these offices, the Receiver recovered assorted files and other materials related to the Entities operations, as well as several

desktop computers and cellular telephones. Subsequent examination of data extracted from these devices[3] proved vital to the performance of the Receiver's duties. Indeed, the materials recovered by the Receiver has yielded critical information, including digital records of communications, information relating to the transfer of Entity funds, and information relating to the roles played by Entity personnel. This information has enabled the Receiver to identify the amounts and timing of specific monetary transfers, the identities of some alleged victims, and the location and value of certain recoverable Assets.

### B. Accounting For Entity Funds And Transactions.

During the Reporting Period, the Receiver and his staff continued their accounting efforts, reviewing bank statements and other materials obtained from financial institutions used by the Receivership Entities and their principals to identify and account for customer deposits/payments, and the Entities' use of those funds. The Receiver and his staff continue to pursue additional information to be incorporated into their accounting, including the information described in Section III.A, above.

During the Reporting Period, the Receiver, informed by his ongoing analysis of defendant Michael Nabati's financial records, concluded that Mr. Nabati had purchased a potentially sizeable amount of cryptocurrency with funds diverted from the Entities. The Receiver is in the process of working with the relevant cryptocurrency exchange in order to determine whether Mr. Nabati continues to hold Estate Assets on the exchange, and to obtain any other information that would enable the Receiver to trace Estate funds that have, at any point, been converted into cryptocurrency or other crypto assets, in the hopes of recovering such assets for the benefit of the Estate. The Receiver has sent a turnover demand to the

---

[3] To minimize costs to the Estate, the Receiver agreed to transfer the hard drives and cell phones to the FTC for a forensic analysis and drive imaging. The Receiver later received a copy of the data extracted by the FTC's forensics team.

cryptocurrency exchange, but, as of the date of this Report, has not received a response. The Receiver also understands and believes that the Regulators have separately contacted the cryptocurrency exchange. The Receiver is awaiting additional information the funds held at the exchange, and will update the Court on this matter in future submissions.

### C. Asset Recovery.

#### 1. Existing Recoveries.

As of the date of this Report, the Receiver has recovered over $2.4 million in Receivership Assets for the benefit of the Estate, and currently holds approximately $2.18 million, after the payment of professional fees and expenses, and certain miscellaneous costs, but before payment of administrative and professional fees and expenses incurred after January 31, 2023. The Receiver has transferred the majority of this balance to a high-yield savings account to generate interest during the pendency of the receivership to maximize any recovery for creditors, including allegedly defrauded mortgage modification scam victims. The bulk of these funds are comprised of the net sales proceeds obtained from the sale of two real properties owned by The Michael R. Nabati Irrevocable Living Trust dated December 23, 2020 (the "Trust"), and to which the Receiver had traced diverted Receivership Assets.

The following table summarizes the Receiver's cash recoveries:

| Source | Amount |
| --- | --- |
| Bank Balance Turnovers | $24,695.61 |
| 9002 Five Harbors Drive, Huntington Beach, California (Net Sales Proceeds) | $425,477.62 |
| 21202 Spurney Lane, Huntington Beach, California (Net Sales Proceeds) | $2,023,331.00 |
| TOTAL: | $2,473,504.23 |

The Receiver believes that additional recoveries may be obtained in connection with the assets and claims described in subsections 2 and 3, below:

### 2. Remaining Real Properties.

As noted in the Second Interim Report, the Trust remains the record owner of the real properties located at 109 Harbor Woods Place #109 and 203 Harbor Woods Place #203, Newport Beach California (the "Properties"), and against which the Receiver has established a claim for diverted funds. During the Reporting Period, the Receiver engaged in successful negotiations with Mr. Nabati regarding the surrender of the Properties to the Receiver, resulting in a joint stipulation approved by this Court's Order Approving Stipulation for Order: (1) Authorizing Receiver to Market and Sell Residential Real Properties; and (2) Releasing Defendant's Claim to Proceeds Recovered or Held by Receiver [Dkt. 195] [EFC No. 196]. Pursuant to the Court's order, the Receiver as empowered to market and sell the Properties, and to retain the resultant net proceeds for the benefit of the Estate, free and clear of any and all claims held by Mr. Nabati. Since the entry of the Court's order, the Receiver and his staff have taken efforts to address outstanding permitting and other issues associated with the Properties, prepared them for re-listing for sale, and presently anticipate that both of the Properties will be sold within the next 60 to 90 days, resulting in aggregate sales proceeds for the benefit of the Estate in the amount of approximately $1 million.

### 3. Potentially Fraudulent Transfers.

As noted above, the information obtained and reviewed (or under review) by the Receiver as of the date of this Report suggests that, in addition to the diversions of funds previously documented by the Receiver in his Second Interim Report, at least several hundred thousand dollars in Entity funds may have been fraudulently transferred to third parties, including at least one individual defendant and persons affiliated with another individual defendant. At present, the Receiver is completing his review of records relevant to these suspected fraudulent transfers, and

determining whether he needs to seek the recovery of additional records, or whether the records already obtained are sufficient to make a recommendation regarding prospective civil prosecutions to the Court, and whether such prosecutions can be justified on a cost/benefit basis. The suspected transfers identified to date include:

(a) *Defendant Armando Solis Barron's La Habra Heights Property and an Associated $500,000 Transfer.*

While defendant Armando Solis Barron has denied participating in the alleged fraud conducted through the Entities, he has admitted that on or around October 5, 2021, he received a transfer from Mr. Nabati in the amount of $500,000[4] – which he previously argued should be the limit of his liability in this action[5] – and that he applied these funds to the acquisition of a real property located at 1500 La Riata Drive, La Habra Heights, California, 90631 (the "La Habra Property"). On July 24, 2023, the Regulators filed a Notice of Pendency of Action [ECF No. 226], as to the La Habra Property, which may be subject to turnover to the Receiver. Even if the La Habra Property itself is ultimately determined not to be a Receivership Asset, the $500,000 he received through Mr. Nabati, and which appears to have been diverted from the Entities, may be recoverable as a fraudulent transfer.

(b) *Transfers to Additional Third Parties.*

In addition to the transfer which Mr. Solis Barron has admitted to receiving, the materials obtained by the Receiver strongly suggest that hundreds of thousands of dollars in additional funds were diverted from the Entities to non-parties affiliated with at least one other individual defendant in this action, which funds appear also to have been used in connection with the purchase of real property. At present, the Receiver is not prepared to disclose the identities of the suspected fraudulent

---

[4] Decl. of Armando Solis Baron in Supp. of Opp'n to Mot. for Summ. J. 5 [ECF No. 217-1].
[5] Def. Armando Solis Barron's [*sic*] Opp. to Pl's Mot. for Summ. J. 9 [ECF No. 216].

transferees in a public forum, absent further instruction from the Court. However, should the Receiver ultimately confirm the suspected transferees' receipt of Entity funds, he will identify the transferees and the associated transactions in connection with his recommendations to the Court regarding potential disgorgement litigation.

### D. Reestablishing Communications Between Alleged Scam Victims And Their Mortgage Lenders.

While the vast majority of the Receiver's efforts have been tied to investigating, tracing, and accounting for the cash proceeds of the alleged fraud, he has also sought to enable apparent victims of the alleged mortgage scam to mitigate their injuries. Among other things, after confirming that what limited communications the Entities transmitted to consumer lenders contained representations to the effect that lenders should communicate exclusively with the Entities[6] – not the borrowers – the Receiver sought to reestablish direct communications between any borrowers still seeking mortgage modifications and their respective lenders. To that end, during the Reporting Period, the Receiver contacted all mortgage lenders and services whom his records suggested had previously been contacted by the Entities, informing them of the pending receivership and the fraudulent scheme alleged by the Regulators, and encouraging these lenders and servicers to reestablish direct communications with their borrowers to, among other things, engage in loan modification negotiations where possible. The Receiver also provided copies of relevant pleadings and other records to known Entity consumers. While this undertaking will not result in any direct cash recovery for the Estate, the commencement or recommencement of loan

---

[6] Indeed, the Receiver has recovered from the offices of the Receivership Entities loan modification letters that the Entities received from lenders, directed to the Entities' customers, but addressed to the Entities themselves. Such letters appear not to have been acted upon, nor forwarded to borrowers. In other words, the Receivership Entities provided little, if any, actual loan modification services in exchange for their fees, and worse, actively hindered their consumers' efforts to obtain loan modification from their respective lenders.

modification negotiations could ultimately prove to be of substantial benefit to alleged consumer victims by mitigating future harm (financial or otherwise) to those consumers who may still be failing to make mortgage payments in reliance on the Entities' promises that a modification had been approved. As of the date of this Report, the Receiver and his counsel have already fielded numerous inquiries from lenders, servicers, and borrowers. Anecdotally, these inquiries appear to relate to renewed loan modification negotiations, which may help mitigate some of the more pernicious effects of the Entities' malign activities.

### E. Preliminary Development Of Prospective Claims Process Or Restitution Fund.

As noted above, to date the Receiver has successfully recovered nearly $2.5 million for the benefit of the Estate, and he expects that his continued efforts will yield at least another $1 million from the anticipated sale of the Properties. After payment of administrative fees and expenses, the funds held by the Receiver could be used to compensate victims of the alleged mortgage scam, either directly by the Receiver via a Court-administered claims and distribution process, or by transferring the Receiver's net recovery to the Regulators or otherwise establishing a restitution fund. The Receiver is presently evaluating the costs and benefits associated with potential claims and distribution scenarios, and anticipates providing the Court with a recommendation, after discussion with the Regulators, in his next interim report, assuming the Court authorizes the continued existence of the receivership as recommended below.

## IV. RECEIVER'S RECOMMENDATIONS AND PETITION FOR INSTRUCTIONS.

As noted above, the Receiver has made significant process satisfying his obligations under the Appointment Order, and has already collected nearly $2.5 million for the benefit of the Estate and its creditors, to say nothing of an additional anticipated recovery of approximately $1 million from the sales of the

remaining Properties, and any prospective recoveries of funds unlawfully diverted from the Entities. Of course, work remains to be done in connection with the anticipated sales of the Properties and the Receiver's investigation and recommendations regarding potential fraudulent transfer or disgorgement claims. Accordingly, the Receiver believes, in his reasonable business judgment, that there is good cause for maintaining the present receivership for at least another 120 days, during which time the Receiver intends to:

- Complete the sale of the Properties;
- Continue to negotiate with relevant parties to determine whether an agreement can be reached with respect to turnover or sale of Assets against which the Estate has a claim;
- Continue to supplement his investigation and analysis of the Estate's prospective claims arising from pre-receivership diversions of Entity funds;
- Coordinate with the Regulators to determine the most cost-effective manner for making funds available to compensate alleged consumer victims; and
- Prepare, at least, an additional interim report to the Court setting forth the results of the above efforts. In the event the Receiver determines that the prosecution of fraudulent transfer claims is justifiable on a cost/benefit basis, he may also file a supplemental report or motion seeking specific litigation and settlement authority from the Court.

While the Receiver is sensitive to the cost and delay associated with continuing the instant receivership, he anticipates that the completion of the above work is in the best interest of the Estate, as evidenced by the results to date, and because his efforts are likely to result in at least an additional $1 million in recoveries for the benefit of the Estate and its creditors, including alleged consumer victims.

## V. CONCLUSION.

Based on the information presented herein, and given the Receiver's ongoing efforts in connection with his duties under the Appointment Order, the Receiver recommends that the Court authorize the Receiver to continue to perform his duties as established under the Appointment Order, and to submit a Fourth Interim Report and Petition for Instructions (or Final Report and Accounting) approximately 120 days after the submission of this Report, to address any progress made and conclusions reached by the Receiver, and to present any additional recommendations to the Court.

Dated: August 17, 2023

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
DAVID R. ZARO
JOSHUA A. DEL CASTILLO
MATTHEW D. PHAM

By: /s/ *Joshua A. del Castillo*
JOSHUA A. DEL CASTILLO
Attorneys for Receiver
DAVID P. STAPLETON