DAVID R. ZARO (BAR NO. 124334)
E-Mail: dzaro@allenmatkins.com
JOSHUA A. DEL CASTILLO (BAR NO. 239015)
E-Mail: jdelcastillo@allenmatkins.com
MATTHEW D. PHAM (BAR NO. 287704)
E-Mail: mpham@allenmatkins.com
ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
865 South Figueroa Street, Suite 2800
Los Angeles, California 90017-2543
Phone: (213) 622-5555
Fax: (213) 620-8816

Attorneys for Receiver
DAVID P. STAPLETON

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>GREEN EQUITABLE SOLUTIONS, et al.,<br><br>Defendants. | Case No. 2:22-cv-06499-FLA-MAR<br><br>**FINAL REPORT AND ACCOUNTING OF RECEIVER, DAVID P. STAPLETON**<br><br>[Related Notice of Motion and Motion; Memorandum of Points and Authorities; Declaration of David P. Stapleton; Final Fee Application; and [Proposed] Order submitted concurrently herewith]<br><br>Date: May 3, 2024<br>Time: 1:30 p.m.<br>Judge Hon. Fernando L. Aenlle-Rocha<br>Ctrm: 6B |

**TO THIS HONORABLE COURT AND ALL INTERESTED PARTIES:**

**PLEASE TAKE NOTICE** that David P. Stapleton (the "Receiver"), the Court-appointed receiver for Defendants Green Equitable Solutions, also dba Academy Home Services; South West Consulting Enterprises, Inc. also dba Academy Home Service, Atlantic Pacific Service Group, Golden Home Services of America Enterprises, and Home Matters USA; Apex Consulting & Associates Inc. also dba Golden Home Services America and Home Matters USA Consulting; Infocom Entertainment Ltd., Inc., also dba Amstar Service Group, Atlantic Pacific

Service, and Home Relief Service of America; and their respective subsidiaries and affiliates, including but not limited to The Michael R. Nabati Irrevocable Living Trust dated December 23, 2020 (each an "Entity", and collectively, the "Receivership Entities" or "Entities") hereby submits this *Final Report and Accounting of Receiver, David P. Stapleton* (this "Final Report") in accordance with Local Rule 66-6 and this Court's September 14, 2022 *Order Granting Plaintiffs' Ex Parte Application For Temporary Restraining Order With Asset Freeze, Appointment Of Temporary Receiver, Limited Expedited Discovery, And Order To Show Cause Why Preliminary Injunction Should Not Issue* (the "Appointment Order") [ECF No. 25], as reaffirmed by the Court's September 29, 2022 *Order Granting Plaintiffs' Request For Preliminary Injunction With Asset Freeze And Extending Authorization Of Temporary Receiver Through The Pendency Of The Action* (the "Preliminary Injunction") [ECF No. 40].

This Final Report, submitted in connection with the concurrently filed *Motion of Receiver, David P. Stapleton, For Order: (1) Approving Final Report And Accounting; (2) Authorizing Payment Of Final Fee Application Of Receiver And Professionals; (3) Establishing Reserve For Costs Of Closing Receivership; (4) Authorizing Transfer Of Receivership Assets To Plaintiff Regulators; (5) Authorizing Abandonment Or Destruction Of Records; and (6) Closing Receivership Case And Discharging Receiver* (the "Wind-Down Motion"), summarizes the actions and efforts undertaken by the Receiver during the pendency of the present receivership, through February 29, 2024, with special attention to recent developments and information, including matters of particular relevance to the Wind-Down Motion.

## I. EXECUTIVE SUMMARY.

As reflected in the Appointment Order and Preliminary Injunction, the Receiver's duties included, among other things, assuming control over the Receivership Entities and their assets ("Receivership Assets" or "Assets");

recovering all available books and records relating to or concerning the Entities' business and financial activities; performing an analysis of those business and financial activities; and marshaling available Assets for the benefit of the receivership estate (the "Estate") and its creditors.

As reflected in his prior submissions to the Court, the Receiver previously concluded that: (a) the pre-receivership business operations of the Receivership Entities were consistent with a fraudulent enterprise; (b) the Receivership Entities could not, in his reasonable business judgment, be operated as a going concern, individually or collectively; (c) millions of dollars obtained from the Entities' customers were diverted to or for the benefit of the Receivership Entities' alleged principals, affiliated entities under their control, or other affiliated persons; (d) such diverted funds were used to purchase Assets against which the Estate had a claim – many of which the Receiver has since recovered and sold, pursuant to orders of this Court, generating millions of dollars in recoveries; and (e) although the Receiver may hold potentially viable Asset turnover claims against two third parties, the pursuit of such claims is not justifiable on a cost-benefit basis, particularly given that one such claim appears to be duplicative of a claim alleged by the plaintiffs Federal Trade Commission and California Department of Financial Protection and Innovation (collectively, the "Regulators"), and the other is likely not worth the cost of pursuit by the Receiver.[1]

Accordingly, and as detailed further herein, the Receiver has determined that the continued pendency of the receivership is no longer justifiable on a cost-benefit basis, and should be wound down and concluded. The Receiver has completed his document review and analysis, investigation, Asset recovery, and Asset liquidation efforts, and has believes, in his business judgment, that further administration of the

[1] As detailed further herein, the Receiver reserves the right, consistent with the terms of the Appointment Order and Preliminary Injunction, to sell or assign any claims he determines to be of value to the Estate, in order to obtain additional funds for the benefit of the Estate and its creditors, if possible.

present receivership would yield no benefit to the Estate or its creditors as compared to the likely cost of such administration. As such, and as reflected in the concurrently filed Wind-Down Motion, the Receiver believes it is now appropriate to wind down and conclude the receivership, and discharge and release the Receiver from his duties and obligations under the Court's orders.

As of the filing of this Final Report, the Receiver has recovered approximately $3.6 million in Assets for the benefit of the Estate, comprised largely of (1) the proceeds of the Receiver's sales of four (4) real properties (the "Real Properties"), the purchase money for which he has confirmed included funds diverted from the Entities; along with (2) turnovers of funds from the Receivership Entities' bank accounts; and (3) funds turned over from accounts subject to this Court's recently entered February 2, 2024 *Order Granting Plaintiffs' Motion for Summary Judgment Against Defendants Michael Robin Nabati, Armando Solis Barron, Dominic Ahiga, and Roger Scott Dyer* [ECF No. 323], and *Order Granting Plaintiffs' Application for Default Judgment* [ECF No. 324] (collectively, the "Judgments").

To date, the Court has approved the payment of the Receiver and his professionals' fees and expenses in the total amount of $509,229.63. By way of the concurrently submitted *Final Fee Application of Receiver, David P. Stapleton* (the "Final Fee Application"), the Receiver, on behalf of himself and his counsel, Allen Matkins Leck Gamble Mallory & Natsis, LLP ("Allen Matkins", and collectively with the Receiver, the "Applicants"), has requested approval of the fees earned and expenses incurred for the period from November 1, 2023, through February 29, 2024, in the aggregate amount of $124,149.97. In addition, in the Wind-Down Motion, the Receiver has requested authority to establish a $30,000 reserve (the "Reserve") to cover the fees and expenses expected to be incurred after February 29, 2024 in connection with the wind-down and termination of the receivership.

As of March 31, 2024, the Receiver held approximately $3 million for the benefit of the Receivership Entities and their Estate. Assuming that the Court grants the Final Fee Application, and authorizes the establishment of the Reserve, and after their deduction from the cash on-hand, the Receiver would hold cash Assets in the amount of at least approximately $2.8 million. This financial information, and more, is detailed in the Receiver's accounting summary, styled *FTC v. Green Equitable Solutions: Cash Receipts & Disbursements* (the "Final Accounting"), attached hereto as **Exhibit 1**.

As addressed in the Wind-Down Motion, the Receiver has conferred extensively with the Regulators concerning the best means of making the recovered Assets available for restitution to injured Entity customers, and has concluded that, under the facts of this case and given the costs attendant to a Receiver-administered claims and distribution process, remitting the Assets to the Regulators for potential distribution to defrauded consumers is the most cost-effective solution.

## II. GENERAL BACKGROUND.

The Court and all interested parties are invited to review the following materials for an even more detailed summary of the relevant facts underlying the above-entitled action and the instant receivership:

- Complaint for Permanent Injunction, Monetary Relief, and Other Relief (filed on September 12, 2022, ECF No. 1);
- Appointment Order (entered on September 14, 2022, ECF No. 25);
- Initial Report and Recommendations of Receiver, David P. Stapleton (filed on September 26, 2022, ECF No. 36);
- Preliminary Injunction (entered on September 29, 2022, ECF No. 40);
- First Amended Complaint for Permanent Injunction, Monetary Relief, and Other Relief (filed on October 28, 2022, ECF No. 43);

- Notice of Designation of Non-Party, The Michael R. Nabati Irrevocable Living Trust dated December 23, 2020, as a Receivership Entity (filed on November 4, 2022, ECF No. 50);
- First Interim Report (filed on November 18, 2022, ECF No. 60);
- Receiver's Notice of Completion of Sale of Real Property Located at 21202 Spurney Lane, Huntington Beach, CA 92646 (filed on January 31, 2023, ECF No. 132);
- Second Interim Report and Petition for Instructions of Receiver, David P. Stapleton (filed on March 22, 2023, ECF No. 158);
- Order Approving Stipulation for Order: (1) Authorizing Receiver to Market and Sell Residential Real Properties; and (2) Releasing Defendant's Claim to Proceeds Recovered or Held by Receiver [Dkt. 195] (entered on June 21, 2023, ECF No. 196);
- Order Granting Plaintiffs' Request for Preliminary Injunction With Asset Freeze and Extending Authorization of Temporary Receiver Through the Pendency of the Action [Dkt. 188] (entered on July 5, 2023, ECF No. 210);
- Third Interim Report and Petition for Instructions of Receiver, David P. Stapleton (filed on August 17, 2023, ECF No. 247);
- Order Authorizing Receiver to Consummate Sale of Residential Real Properties Pursuant to Terms of Applicable Purchase and Sale Agreements [Dkt. 280] (entered on November 9, 2023, ECF No. 281);
- Fourth Interim Report and Petition for Instructions of Receiver, David P. Stapleton (filed on December 13, 2023, ECF No. 290);
- Order Granting Plaintiffs' Motion for Summary Judgment Against Defendants Michael Nabati, Armando Solis Barron, Dominic Ahiga, and Roger Scott Dyer [Dkt. 184] (entered on February 2, 2024, ECF No. 323);

- Order Granting Plaintiffs' Application for Default Judgment [Dkt. 250] (entered on February 2, 2024, ECF No. 324); and
- Supplemental Report and Petition for Instructions of Receiver, David P. Stapleton (filed on February 7, 2024, ECF No. 325).

The Regulators' September 12, 2022, *Complaint for Permanent Injunction, Monetary Relief, and Other Relief* alleged that the Receivership Entities and their principals engaged in a fraudulent mortgage modification scheme whereby distressed mortgage borrowers were induced to make payments to the Receivership Entities in exchange for loan modification services which were rarely, if ever, provided, and the proceeds from which were diverted by the Receivership Entities and their principals for their unilateral benefit.

As detailed below, in order to determine the nature of the Receivership Entities' business and financial activities, and to trace as many of the funds they raised as possible, the Receiver engaged in an extensive discovery and document analysis effort. Based upon his review and analysis of relevant materials relating to the business and financial activities of the Entities, the Receiver concluded that the Regulators' allegations were essentially correct, and further that the Entities could not be operated as a viable going concern. In addition, the Receiver determined that significant Assets (largely real properties) were purchased with funds raised by the Entities from defrauded consumers and diverted for the benefit of the Entities, their principals, or affiliated entities under their control. The Receiver was successful in obtaining authority and control over these assets and, with Court permission, overseeing their marketing and sale, generating millions of dollars in recoveries for the Estate. Having completed these real property sale efforts, and having collected all seemingly available Entity and judgment debtor account funds, the Receiver has determined that the continued pendency of the receivership is no longer justifiable on a cost-benefit basis. As such, and as noted above and in the Wind-Down Motion, the Receiver believes it is now appropriate to wind down and terminate the

receivership, and discharge and release the Receiver from his duties and obligations under the Court's orders.

## III. SUMMARY OF RECEIVER'S ACTIVITIES.

As reflected in the Receiver's prior reporting to this Court [*see, e.g.*, ECF Nos. 36, 60, 158, 247, 290, and 325], during the pendency of the receivership, the Receiver focused the bulk of his efforts on the following key areas:

### A. Investigation And Analysis Regarding The Operations Of The Receivership Entities.

Over the course of the receivership, the Receiver sought and obtained relevant documents and other information relating to the business and financial activities of the Entities from a variety of sources, including the physical offices of the Entities themselves, the Entities' customers, banks, escrow companies, payment processors, domain registrars, cloud-hosting platforms, and other third parties believed or suspected to have conducted business with the Receivership Entities. The Receiver's discovery efforts proved successful, resulting in the production of tens of thousands of pages of documents, including financial statements associated with over 100 Entity-related accounts, the extensive review of which enabled the Receiver to better understand how – and how much – the Entities raised from defrauded consumers, and how, and in what amounts those funds were diverted for purposes unrelated to the advertised operations of the Entities.

On the basis of his document review and analysis suggested the Receiver concluded that, while the Entities were consistent in their marketing and billing practices, they provided, at best, limited mortgage modification services. Additionally, the Entities or their principals and agents: (a) kept few, if any, reliable accounting or customer records; (b) did not make payments internally (to themselves or staff) in a manner consistent with regular payroll practices – indeed, text messages obtained by the Receiver suggest that the Entities' principals routinely instructed employees to withdraw cash from Entity accounts funded with consumer

payments, retain a variable percentage for themselves in an amount apparently unrelated to any specific service or customer result, and remit the remainder to the principals, again, in cash; and (c) made use of aliases and otherwise disguised the identities of those involved, in an apparent effort to disguise their receipt and use of Receivership Assets. In light of the above, and given that the records obtained by the Receiver indicated very limited legitimate business conducted by the Entities, the Receiver concluded that the Entities were not viable as a going concern.

**B. Accounting For Entity Funds And Transactions.**

Throughout the pendency of the receivership, the Receiver and his staff devoted significant effort to forensic accounting efforts, including by undertaking a detailed review of Entity bank statements and other financial documents, communications pertaining to the Entities' funds and finances, and materials relating to customer communications and payments. Among other things, the Receiver confirmed that: (a) the Receivership Entities raised millions of dollars from consumers; (b) significant funds raised from consumers were diverted from the Entities to, or for the benefit of, the principals of the Entities or other affiliated persons, including but not limited to diversions of at least $2.6 million to The Michael R. Nabati Irrevocable Living Trust dated December 23, 2020 (the "Trust") for the benefit of defendant and judgment debtor Michael Nabati; (c) the Trust applied funds diverted from the Entities to the purchase of the Real Properties, as detailed in Section III.C.1, below; (d) defendant and judgment debtor Armando Solis Barron received diverted funds in the amount of least $500,000, as detailed in Section III.C.3, below; and (e) the Entities' principals consistently mischaracterized or obscured their receipt and use of Entity funds.

**C. Asset Recovery and Liquidation.**

As noted above, as of the date of this Final Report, the Receiver has recovered approximately $3.6 million for the benefit of the Estate and its creditors.

The Receiver's recoveries to date are set forth in the following table:

| **Source** | **Net Recovery Amount** |
|---|---|
| Bank Balance Turnovers | $24,695.61 |
| Turnovers Pursuant to the Judgments | $78,446.51 |
| 9002 Five Harbors Drive, Huntington Beach, California | $425,477.62 |
| 21202 Spurney Lane, Huntington Beach, California | $2,023,331.00 |
| 203 Harbor Woods Place, Newport Beach, California | $844,670.39 |
| 109 Harbor Woods Place, Newport Beach, California | $212,809.05 |
| **TOTAL:** | $3,609,430.18 |

1. Real Property Sales.

As discussed in Section III.B, above, the Trust received diverted Entity funds in the aggregate amount of approximately $2.675 million, which the Trust used to purchase the Real Properties, located at the following addresses: (1) 9002 Five Harbors Drive, Huntington Beach, California (the "Five Harbors Property"); (2) 21202 Spurney Lane, Huntington Beach, California (the "Spurney Lane Property"); (3) 203 Harbor Woods Place, Newport Beach, California; and (4) 109 Harbor Woods Place, Newport Beach, California (collectively, with the preceding property, the "Harbor Woods Properties").

The Receiver-supervised sale of the Real Properties is discussed below:

*(a) 9002 Five Harbors Drive and 21202 Spurney Lane*

On November 23, 2022, the Receiver and Mr. Nabati completed discussions regarding the surrender to the Receiver of the Spurney Lane Property and the Five Harbors Property, memorialized in a joint stipulation approved via this Court's November 23, 2022 *Order Approving Stipulation for Order: (1) Withdrawing Receiver's Pending Ex Parte Application; (2) Authorizing Real Property Sales; and (3) Directing Net Proceeds of Real Property Sales to be Remitted to Receiver, Subject to Reservation of Rights* (the "Spurney and Five Harbors Sale Order") [ECF

No. 67], pursuant to which the Receiver completed the sales of the Five Harbors Property and Spurney Lane Property, resulting in net recoveries to the Estate in the respective amounts of $425,477.62 and $2,023,331.00.

*(b) The Harbor Woods Properties*

On June 21, 2023, the Receiver and Mr. Nabati completed discussions regarding the surrender to the Receiver of the Harbor Woods Properties, memorialized in a joint stipulation approved via this Court's June 21, 2023 *Order Approving Stipulation for Order: (1) Authorizing Receiver to Market and Sell Residential Real Properties; and (2) Releasing Defendant's Claim to Proceeds Recovered or Held by Receiver* (the "Harbor Woods Sale Order") [ECF No. 196].

The Harbor Woods Sale Order authorized the Receiver to market and sell the Harbor Woods Properties and to retain the resultant net proceeds for the benefit of the Estate, free and clear of any and all claims held by Mr. Nabati or the Trust. Following the completion of necessary repairs and the resolution of certain outstanding permitting issues, the Receiver completed the sales of the Harbor Woods Properties, resulting in a net aggregate recovery to the Estate in the amount of $1,057,479.44.

2. Receivership Entity Bank Accounts.

Immediately upon his appointment, the Receiver transmitted notice of the Appointment Order (including the asset freeze and turnover provisions thereof) to numerous banks and financial institutions, requesting the turnover of any accounts maintained by, in the name of, or for the benefit of the Receivership Entities (the "Estate Accounts"). Unfortunately, at the time of the Receiver's appointment, the accounts in question had largely been depleted and, while the Receiver did successfully establish control over the Estate Accounts, only $24,695.61 was recovered.

3. Potentially Fraudulent Transfers.

*(a) Transfer to Defendant Solis Baron.*

Judgment debtor Solis Barron has admitted that on or around October 5, 2021, he received a transfer (characterized as a loan) from judgment debtor Nabati in the amount of $500,000[2], and that he applied these funds to the acquisition of a real property located at 1500 La Riata Drive, La Habra Heights, California, 90631 (the "La Habra Property"). The $500,000 Mr. Solis Barron received from Mr. Nabati was diverted from the Receivership Entities, and thus appears to have been a fraudulent transfer. On July 24, 2023, the Regulators filed a *Notice of Pendency of Action* [ECF No. 226], as to the La Habra Property.

While the Receiver has determined that Mr. Solis Barron was the recipient of at least $500,000 in fraudulent transfers from the Entities, he has also concluded that the Estate's prospective fraudulent transfer claim against Mr. Solis Barron would be duplicative of already successful claims asserted by the Regulators against Mr. Solis Barron. Accordingly, the Receiver determined, in his reasonable business judgment, that cost-effectiveness favored permitting the Regulators to continue the prosecution of their claims, unimpeded by any parallel receivership litigation undertaken at additional, and likely unnecessary, expense.

*(b) Transfer to Attorney Sara Azari.*

In reviewing records relating to funds obtained by defendant Michael Nabati and affiliated persons, the Receiver concluded, in his reasoned opinion, that at least $50,000 of a $100,000 payment to attorney Sara Azari, who briefly acted as counsel of record for Mr. Nabati in this action, appears to have been paid out of the proceeds of a loan[3] obtained by the Trust prior to its designation as a Receivership Entity, and

---

[2] Decl. of Armando Solis Barron in Supp. of Opp'n to Mot. for Summ. J. 5 [ECF No. 217-1].

[3] This loan was paid off at the time the Receiver-supervised sale of the Spurney Lane Property was concluded, meaning that the funds available to the Estate from the sale were diminished by the loan payoff amount.

secured by the Spurney Lane Property. More specifically, the Receiver has concluded that a portion of the proceeds of this loan were paid out to Mr. Nabati's parents who, in turn, wired the funds in issue to attorney Azari. Based on the records presently available, the Receiver presently believes, in his reasoned opinion, that the payment of these funds to attorney Azari represents a fraudulent transfer, and that the funds in issue are subject to disgorgement.

As detailed further, below, the Receiver has made a turnover demand to attorney Azari in connection with this payment. Through counsel, attorney Azari has contested the Receiver's fraudulent transfer conclusion, and asserted certain affirmative defenses. The Receiver does not presently believe that the affirmative defenses asserted are valid, and he will continue to work with attorney Azari until the time of his discharge in an effort to obtain the return of additional funds for the benefit of the Estate.

**D. Reestablishing Communications Between The Entities' Consumers And Their Respective Mortgage Lenders.**

In certain instances, the Entities, upon being engaged to serve as a borrower's representative in loan modification negotiations, transmitted letters to their customers' lenders, providing notice of their engagement and instructing the lenders to communicate exclusively with the Entities, not the borrowers. In accordance with this directive, critical loan-related communications, including modification offers, were sent to the Entities, which do not appear to have acted upon such letters or forwarded such letters to their customers. In other words, the Receivership Entities provided little, if any, actual loan modification services in exchange for their fees, and worse, may have actively hindered their customers' efforts to obtain loan modifications from their respective lenders.

During the pendency of the receivership, the Receiver took steps to reestablish direct communications between the Entities' customers and their respective lenders, contacting all lenders whom his records suggested had

previously been contacted by the Entities, informing the lenders of the pending receivership and the fraudulent scheme alleged by the Regulators, and encouraging these lenders to reestablish direct communications with their borrowers. The Receiver also provided copies of relevant pleadings and other records to known Entity consumers, and to certain lenders, upon request. Subsequently, the Receiver and his counsel fielded numerous inquiries from lenders, borrowers, and certain affiliates thereof. Anecdotally, these inquiries appear to have resulted in some renewed loan modification negotiations, which may mitigate some of the more pernicious effects of the Entities' malign activities.

## IV. SUMMARY OF RECEIVER'S RECENT ACTIVITIES.

### A. Receipt Of Payments In Satisfaction Of The Judgments.

The Court entered the Judgments on February 2, 2024. Each of these obligated certain financial institutions and other entities in possession or control of the judgment debtors' assets to turn over such assets to the Receiver, in partial satisfaction of the Judgments awarded to the Regulators.

Since February 7, 2024, the Receiver has received approximately $78,447 in turnovers in connection with the Judgments, but understands that additional funds likely remain outstanding, which funds may be turned over to the Receiver in the coming weeks. The Receiver will continue to serve as the designated recipient for any such funds pending the termination of the receivership and will turn over those funds received as part of the turnover to the Regulators proposed herein.

### B. Outstanding Turnover Demand.

As of the date of the filing of this Final Report, the Receiver is still working to resolve his $50,000 turnover demand to attorney Sara Azari. As noted above, attorney Azari has indicated, through counsel, that she contests the Receiver's conclusion regarding the nature of the $50,000 transfer in issue.

Given the amount in controversy as measured against the prospective expense and delay associated with litigating a disgorgement action, the Receiver is presently

of the opinion that, on a cost/benefit basis, pursuit of these funds via litigation is likely not be justifiable, particularly at this stage in the receivership. Nonetheless, the Receiver will continue to press attorney Azari for the return of the funds in issue prior to his discharge. Should he be unable to negotiate a repayment, the Receiver reserves the right to sell and assign any claim he holds to a third party, in accordance with his authority under the Appointment Order and Preliminary Injunction, provided that he determines a sale and assignment will result in the recovery of additional funds for the Estate, and that an appropriate buyer can be located and a sale completed prior to his discharge and release as Receiver.

## V. RECEIVERSHIP WIND-DOWN RECOMMENDATIONS.

As reflected herein, Receiver has concluded, in his reasonable business judgment, that he has satisfied his obligations to the Estate, and, in the process, undertaken all reasonable efforts to recover those Assets which could appropriately be pursued given the cost-benefit calculus applicable to the Receiver's efforts. At present, the Receiver does not believe there are any remaining tasks arising in accordance with the Appointment Order and Preliminary Injunction which can be justified on a cost-benefit basis. Accordingly, the Receiver recommends that the Court authorize him to commence the wind-down and termination of the instant receivership, as set forth below and in detail in Wind-Down Motion. Specifically, the Receiver's recommendations are as follows:

### 1. Payment of Fees and Expenses Of Receiver And His Professionals.

The Receiver, on behalf of himself and Allen Matkins, has filed his Final Fee Application requesting approval of: (1) fees earned and costs incurred by the Applicants during the period from November 1, 2023 through February 29, 2024; and (2) the establishment of the Reserve. The total amount requested in the Final Fee Application is $154,149.97. Detailed billing invoices and narrative summaries of the work performed by the Applicants are set forth in the Final Fee Application.

If approved, and inclusive of all fees and expenses previously approved by the Court and the Reserve, total fees and expenses for the receivership would reflect approximately 19% of the Receiver's total recoveries in this matter, well below the 25% presumptive reasonableness threshold applied in the Ninth Circuit.

Consistent with prior practice, the Receiver requests authorization to pay the Applicants all fees and expenses requested in the Final Fee Application, out of the Assets presently on-hand.

2. <u>Establishment of the Reserve.</u>

The Receiver and Allen Matkins will incur fees and expenses, beyond those requested in the Final Fee Application, beginning March 1, 2024 and running through the end of the receivership, as they attend to the wind-down tasks necessary to bring the receivership to a close after the submission of this Final Report, the Wind-Down Motion, and the Final Fee Application. The Receiver recommends that the Court authorize him to set aside an amount not to exceed $30,000 (again, the "<u>Reserve</u>") to cover such fees and expenses, to be paid without further order of the Court. Of course, the Receiver and Allen Matkins will endeavor to minimize their respective fees and expenses, and any portion of the Reserve remaining after all wind-down tasks have been completed will be remitted to the Regulators in accordance with those turnover instructions governing the Receiver's recommended turnover of Receivership Assets.

3. <u>Receipt Of Outstanding Turnover Amounts.</u>

As discussed in Section IV.A, above, certain financial institutions and other entities in possession or control of the assets of individual and corporate defendants (and now, judgment debtors) have been instructed to remit such assets to the Receiver. While certain remittances remain outstanding, the Receiver does not believe that the minimal work associated with this obligation will materially impact his completion of the tasks necessary to the winding down of the receivership.

4. Turnover of Receivership Assets to the Regulators.

Based on his discussions with the Regulators regarding the best means of making recovered funds available for restitution to injured consumers, the Receiver has concluded that the most cost-effective method of ensuring that recovered Assets are optimally deployed is to turn over the Assets to the Regulators concurrent with the wind-down and termination of the receivership. In the Receiver's reasonable business judgment, and under the facts of this case, such a course of action would be superior, on a cost-benefit basis, to the alternative of a Receiver-administered claims and distribution process, with its attendant additional expense.

Therefore, the Receiver respectfully requests that the Court authorize him to transfer all Receivership Assets, less the Reserve and the fees and expenses requested in the Final Fee Application, to the Regulators in accordance with whatever turnover instructions they may provide to him. As of the date of this Final Report, the Receiver estimates that the amount he will turn over to the Regulators will exceed $2.8 million.

5. Abandonment or Destruction of Records.

The Receiver is in possession of records obtained during his administration of the Estate, either at the outset of the receivership or recovered from third parties during his investigation into the affairs of the Receivership Entities, some of which are maintained in paper form. Many of these documents contain the personal financial information, or other sensitive information, of mortgage borrowers who sought the services of the Receivership Entities. Accordingly, the Receiver proposes that, within 90 of days after the entry of an order granting this Motion, the Receiver be authorized to destroy any documents containing private information, and further that he be authorized to abandon or destroy the balance of the records in his possession relating to the Receivership Entities and the present receivership.

6. Discharge and Release of Receiver.

The Receiver believes that it is now appropriate to present this Final Report, along with the Final Fee Application and Wind-Down Motion, and to request the Court to terminate the receivership pending his completion of the wind-down tasks set forth herein. Therefore, in order to best preserve limited receivership resources and further limit the cost of administering the Estate, the Receiver recommends that the Court accept this Final Report and require no further reporting in connection with this receivership, instead requiring him to file only a declaration attesting to the completion of the wind-down tasks, and respectfully requests that the receivership be deemed terminated, without further Court order, upon such filing, as detailed further in the Wind-Down Motion.

## VI. CONCLUSION.

Based on the information presented above, the Receiver respectfully requests that this Court enter an order accepting this Final Report, including the appended Final Accounting, and approving the recommendations presented herein.

Dated: April 1, 2024

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
DAVID R. ZARO
JOSHUA A. DEL CASTILLO
MATTHEW D. PHAM

By: */s/ Joshua A. del Castillo*
JOSHUA A. DEL CASTILLO
Attorneys for Receiver
DAVID P. STAPLETON

# EXHIBIT 1

**FTC v. Green Equitable Solutions**
**Cash Receipts & Disbursements**
10/01/2022 - 03/31/2024

| | Inception Through 03/31/2024 |
|---|---|
| **Beginning Cash Balance** | - |
| **CASH RECEIPTS** | |
| TURNOVERS FROM FINANCIAL INSTITUTIONS | |
| Initial Cash Turned Over from Defendant Bank Accounts | 25,448 |
| Cash Turned Over After Regulator Demand Letter | 78,447 |
| TOTAL TURNOVERS FROM FINANCIAL INSTITUTIONS | 103,894 |
| | - |
| SALE OF ASSETS | |
| Sale of Assets | 5,957,000 |
| Exp of Sale - Commissions | (297,850) |
| Exp of Sale - Escrow & Title Charges | (60,205) |
| Exp of Sale - Prof. & Misc Fees | (2,285) |
| Exp of Sale - Loan Cost | (6,535) |
| Exp of Sale - Repair Credits | (8,000) |
| Exp of Sale - Other Expenses | (13,332) |
| NET SALE OF ASSETS | 5,568,792 |
| OTHER INCOME | - |
| Interest on Bank Accounts | 67,121 |
| TOTAL OTHER INCOME | 67,121 |
| **TOTAL RECEIPTS** | **5,739,808** |
| **CASH DISBURSEMENTS** | |
| DIRECT EXPENSES | |
| Business License & Permit | 3,646 |
| Membership Dues & Subscriptions | 132 |
| Repairs & Maintenance | 164,202 |
| Inspection | 788 |
| Computer Tech & Software Expense | 200 |
| HOA Dues | 27,414 |
| Insurance Expense | 1,084 |
| Property Tax | 37,239 |
| Storage Rental | 320 |
| Gas Utilities | 176 |
| Water & Sewer Utilities | 472 |
| Travel Expense | 458 |
| TOTAL DIRECT EXPENSES | 236,130 |
| GENERAL & ADMINISTRATIVE | |
| Receiver Fees | 291,957 |
| Receiver Expenses | 2,255 |
| Legal Fees | 214,515 |
| Bank Charge | 125 |
| TOTAL G & A EXPENSE | 508,852 |
| INTEREST EXPENSE | |
| Interest Expense | 116,286 |
| TOTAL INTEREST EXPENSE | 116,286 |
| OTHER EXPENSES | |
| Loan Payoff from Sale | 1,706,883 |
| Prepaid Income Taxes | 133,287 |
| TOTAL OTHER EXPENSES | 1,840,170 |
| **TOTAL DISBURSEMENTS** | **2,701,438** |
| **Ending Cash Balance** | **3,038,370** |

# STANDARDIZED FUND ACCOUNTING REPORT FOR GREEN EQUITABLE

## Receivership; Civil Court Docket No.

## Reporting Period 10/01/2022 to 03/31/2024

| FUND ACCOUNTING (See instructions): | | | | |
|---|---|---|---|---|
| | | Detail | Subtotal | Grand Total |
| Line 1 | Beginning Balance (as of 10/01/2022) | | 0.00 | |
| | **Increases in Fund Balance:** | | | |
| Line 2 | **Initial Capital** | | 25,447.58 | |
| Line 3 | **Business Refunds** | | | |
| Line 4 | **Rental Income** | | | |
| Line 5 | **Business Asset Liquidation** | | 3,556,282.69 | |
| Line 6 | **Personal Asset Liquidation** | | | |
| Line 7 | **Third-Party Litigation Income** | | | |
| Line 8 | **Miscellaneous – Other** | | 145,567.89 | |
| | **Total Funds Available (Lines 1 – 8):** | | | 3,727,298.16 |
| | ***Decreases in Fund Balance:*** | | | |
| Line 9 | **Disbursements to Investors** | | | |
| Line 10 | **Disbursements for Receivership Operations** | | | |
| *Line 10a* | *Business Asset and Operating Expenses* | | 688,928.26 | |
| | **Total Disbursements for Receivership Operations** | | | 688,928.26 |
| Line 11 | **Disbursements for Distribution Expenses Paid by the Fund:** | | | |
| Line 12 | **Disbursements to Court/Other:** | | | |
| | **Total Funds Disbursed (Lines 9 – 11):** | | | 688,928.26 |
| Line 13 | Ending Balance (as of 03/31/2024): | | | 3,038,369.90 |
| Line 14 | **Ending Balance of Fund – Net Assets:** | | | |
| *Line 14a* | *Cash & Cash Equivalents* | | | |
| *Line 14b* | *Investments* | | | |
| *Line 14c* | *Other Assets or Uncleaned Funds* | | | |
| | Total Ending Balance of Funds – Net Assets | | | 0.00 |
| | | | | **3,038,369.90** |
| | | Detail | Subtotal | Grand Total |
| | ***Report of Items NOT To Be Paid by the Fund:*** | | | |
| Line 15 | **Disbursements for Plan Administration Expenses Not Paid by the Fund:** | | | |
| Line 17 | **DC & State Tax Payments** | | | |
| Line 18 | **No. of Claims:** | | | |
| Line 19 | **No. of Claims/Investors:** | | | |